MILDRED HAGER ELLIOTT et al., Administratrices, Appellees, v. DES MOINES NATIONAL BANK, Appellant, et al., Appellees.

No. 39976.

DECEMBER 13, 1929.

REHEARING DENIED MARCH 21, 1930.

*E. J. Kelly,* for appellant.

*Havner, Flick, Huebner & Powers, Charlton & Parker,* and *Lehmann, Seevers & Hurlburt,* for appellees.

EVANS, J.—The decedent, Hager, died testate on January 30, 1923, leaving his surviving spouse and two daughters as his only heirs at law. We shall have no occasion to consider the provisions of the will. Sufficient to say that  its net result, subject to a few legacies, was to make a statutory distribution of his property. For convenience of speech in this discussion, we shall denominate the plaintiffs *administrators.* On March. 6, 1923, the two daughters were so appointed, and on March 9, 1923, they gave statutory notice of their appointment. The estate was a large one. The preliminary inheritance tax report filed by the administrators listed assets, to the value of $182,000. This comprised $90,000 worth of real estate, $61,800 of bank stock in the Commercial Savings Bank of Des Moines, and other personal property amounting to $23,000. The only indebtedness of the estate consisted of one note for $23,000, held by the Des Moines National Bank. This was secured by the pledge of collateral consisting of 238 shares of bank stock, worth on the market from $150 to $160 per share.

Among the available assets of the estate was more than $10,000 in cash. Within a few days after their appointment, and on March 20, 1923, the administrators, without waiting for the filing of a claim, paid over the bank counter to the defendant bank the sum of $10,000 on the principal of the note, and somewhat more than $900 upon the interest. At the expiration of the six-months period, no claim had been filed against the estate. On January 22, 1924, the bank filed its claim for a purported balance of $13,000 upon the $23,000 note. This claim was immediately approved, both by the administrators and by the court. Contemporaneously with the filing thereof, the administrators filed an application for authority to take up the note in question by the execution of a renewal note, to be signed by the administrators and to be secured by the same pledge of collateral. The ground of this application was the expressed desire of the administrators, as the only adverse parties in in-

terest, to withhold the collateral from sale, and to redeem the same by a payment of the note from the proceeds of other property of the estate as soon as the same could be realized. The application was granted, as prayed. A new note was signed, and payment of interest was made.

Such was the status of the defendant's claim against the estate at the expiration of the twelve-months period following the notice of appointment.

In January, 1925, the administrators presented an application to the court for authority to borrow money by mortgage upon real estate, for the purpose of paying the claim of this defendant. This authority was granted, as prayed. Likewise a later supplemental application to the same effect was granted. This proceeding was had under the provisions of Section 11940, Code, 1924. On February 16, 1925, the administrators applied the proceeds of the mortgage loan upon the claim, to the extent of $10,000; and in June, 1925, they applied such proceeds to the payment of the balance. Up to this point, this defendant was the only claimant who had a claim on file in any class against this estate. On February 5, 1926, a decree was entered by the Polk County district court allowing a claim of $41,900 in favor of Andrew, receiver; and on March 17, 1928, a claim of $32,500 was allowed, upon the claim of Waterbury. These two claims were established and allowed under the ''peculiar-circumstance'' clause of Section 11972.

These two claimants are the parties in interest in this proceeding, and are prosecuting the same in the name of the administrators, pursuant to an understanding or agreement between them. The facts out of which these claims arose, stated briefly, are: That, on January 2, 1925, the Commercial Savings Bank of Des Moines closed its doors. This was the event out of which both claims arose. The claim of $41,900 was predicated upon a 100 per cent assessment upon the capital stock of that bank, of which the decedent owned 419 shares. The claim of $32,500 arose out of a co-surety liability, the decedent having been co-surety with Waterbury upon a bond securing certain deposits in the Commercial Savings Bank. The theory put forward by the plaintiffs is that these claims, though belated, were established as fourth-class claims; that, therefore, they were entitled to prorate with all other fourth-class claims, regardless of

whether such other fourth-class claims had been previously paid or not; that the defendant bank had established only a fourth-class claim; that, therefore, it stood on an equality with these creditors; that the defendant bank had no standing as a claimant for the first $10,000 paid to it, because it never filed any claim therefor. This latter claim was sustained by the district court, and restitution was ordered thereon.

I. With the foregoing outline of the facts before us, we inquire first whether the method adopted by the administrators in the making of the first payment of $10,000 was fatal to the  right of the defendant bank to receive or to retain the same. The argument for the plaintiffs is that the administrators had no right to pay any claim until it had been duly filed, according to the statutory method, and duly approved by the administrators and by the court; that, therefore, the payment became, in a sense, void, as against future claimants. Is the contention tenable? The defendant bank was secured by a pledge of collateral. By the undisputed testimony, the collateral was worth, on the market, not less than $150 per share. It held, therefore, liquid property to the extent of more than $35,000, as security for the $23,000 note. Manifestly, it was to the interest of the estate both to redeem the collateral and to stop interest upon the debt as early as practicable. The bank was not required to file its claim, in order to realize upon its collateral. Throughout the period of the twelve months and for many months thereafter, the value of the collateral on the market was maintained. The burden was undoubtedly on the administrators to justify their course. But the prudence of such an act is not challenged. It was clearly justifiable, under the facts existing at the time. It is a mistake to say that this money was paid under a mistake of fact. There were no facts in existence at that time which would have justified the sacrifice or the neglect of the collateral in the hands of the bank. The bank could have protected itself by a sale of the collateral on the market. This was the very course that the administrators, in the interest of the estate, chose to avoid. They did avoid it in the manner already indicated. It is urged in argument that the bank was not threatening to sell, and that, therefore, there was no necessity upon the administrators to follow the course

which they did. It was enough that the right to sell existed in the bank. The fact that the officers of the bank were lenient and complacent did not change the mutual rights and obligations of the parties. In order to redeem the collateral, the debt must sometime be paid. It is urged in argument by the plaintiffs that no collateral was released upon the payment of the $10,000, and that, therefore, nothing was gained in the interest of the estate by such payment. This is hardly an *equitable* argument. True, it required the payment of the whole before the release of any collateral. But the payment of $10,000 was a substantial step in the accomplishment of that desirable end. Under the facts as they existed at that time, this debt was the only one owed by the decedent. The estate was large. The administrators were the ultimate beneficiaries of it. They acted intentionally in the interest of the estate. The bank adopted their tender of payment. There was no one in the world at that time that was adversely affected by such action. If the administrators had at that time paid the full amount of the note, and thereby redeemed the collateral, they would be in the position of having expended $23,000 of the funds of the estate to redeem collateral to the value of $35,000. Could they be charged with neglect or a failure of prudence for paying such claim without awaiting its filing? That such payment would have been approved by the court is not debatable. The administrators would become entitled to credit themselves with the payment of $23,000 as an expenditure for the benefit of the estate. Administrators are not infrequently called upon to incur expenditure in the salvage of valuable property. Growing crops may be cared for until maturity, and the expenses thereof may be allowed as a part of the cost of administration. Likewise, incumbered chattels may be redeemed, and the expense so incurred need not be filed as claims against the estate. This question is considered to some extent in our recent case of *In re Estate of Harsh*, 207 Iowa 84, and in cases on the subject cited therein. See, also, *In re Estate of Ring*, 132 Iowa 216; 24 Corpus Juris 90; 11 Ruling Case Law 160. We deem it clear that, for the purposes of equity, the first payment of $10,000 by the administrators was a prudent expenditure for the benefit of the estate, as being a *pro tanto* redemption of valuable collateral; that it extinguished the claim *pro tanto* for which the collateral was held, and enabled a full

redemption of the collateral later, by payment of the balance of the debt.

If it was proper for the administrators to thus pay it, it was proper for the bank to receive it. After the payment, the claim was extinguished *pro tanto*. It was thereafter out of the power of the bank to file a claim for that portion of the debt which had been extinguished. We hold at this point, as a matter of equity, that the administrators were entitled to credit for such payment as for a prudent expenditure, and that the defendant bank was justified in accepting the same and in applying the same as a credit upon its secured debt, and that it is equitably entitled to retain the same. As such expenditure, this item became preferred over all claims either of the third or of the fourth class.

II. We are further of the opinion that the payment of the $10,000 on March 20, 1923, by the administrators and the acceptance of the same by the bank constituted, in equity, a filing  of such claim with the administrators and the allowance thereof. As such, it would classify as a third-class claim. We have heretofore held, and more recently in the *Harsh* case, supra, that, where the administrator voluntarily pays a valid claim, though not actually filed, such claim may, in equity, be deemed filed as of the date of payment. In the *Harsh* case we said:

"Section 11959 permits approval by the administrator, and allowance thereon by the clerk, without notice. The filing of his claim by a creditor, or the allowance thereof by the court, is not made a condition precedent to the authority of the administrator to approve and pay it. The administrator may voluntarily pay valid claims against the estate, though they are not filed, and having paid them, is entitled to credit therefor. *In re Estate of Pennock*, 122 Iowa 622; *In re Estate of Wonn*, 80 Iowa 750. The allowance by the administrator is not final. It may still be reviewed. *Ryan v. Hutchinson*, 161 Iowa 575; *McDermott v. Estate of McDermott*, 138 Iowa 351. The act of the administrator in paying debts for which no claims are filed, is not void."

Under the facts as they actually were on March 20, 1923

(not the after events, which no one was bound to foresee), every consideration of equity requires that such claim of the bank to the extent of $10,000 should be deemed filed with the administrators on that day, and allowed by them on that date, subject only to the rights of other claimants who might be prejudiced for want of notice. Of such there were none. In *In re Estate of Wonn,* 80 Iowa 750 (754), we said:

"The claims in controversy were not filed with the clerk, but were presented to the administratrix, and approved by her, within the time prescribed for filing claims of the third class. They were valid claims, which neither the clerk nor court could then have disapproved. The material purposes of the statute were accomplished. A record had not been made, it is true; but the claims were, in effect, assigned to the class to which they belonged. The appellants do not claim that they have been in any manner prejudiced by the omission to file the claims with the clerk within the statutory period of six months, but insist that, by reason of that omission, they have acquired a vested right to a larger dividend than they will receive if the claims are allowed as of the third class. But, since the spirit of the statute has been complied with, we do not think they should be permitted to profit by the omission of a technical requirement which did not in any manner prejudice their interests. In making the payments in question, the administratrix assumed the burden of proving that the claims were valid, and should have been paid. She also incurred the risk of paying more than the assets of the estate would warrant, and is not entitled to an allowance for the amount she has disbursed in excess of the dividends which the court may order paid. But the payments were made on valid claims presented in time to be treated as of the third class, for the benefit of the estate, and we think the administratrix is entitled to an allowance therefor to the amount of the dividends to which the claims treated as of the third class will be entitled. See *Crispin v. Winkleman,* 57 Iowa 523; *Portman v. Klemish,* 54 Iowa 198; *Lockhart v. White,* 18 Tex. 107; *Roberts v. Rogers,* 28 Miss. 154."

The plaintiffs argue that the *Wonn* case is out of harmony with our later decisions, and more particularly with the later case of *Kells v. Lewis,* 91 Iowa 128. Sufficient at this point to

say that it is cited and followed in the *Harsh* case, which is our most recent utterance on the question. Sufficient also, for present purposes, to say that, at the time of such payment by the administrators, they were in no position to complain of a failure to file. They were the only persons in existence whose interests were adverse to the claim at that time and at all times within the period of six months and within the period of twelve months. We hold at this point that equity will regard the claim thus paid as having been presented to, and approved and allowed by, the administrators as of the date of such payment.

III. It remains to consider the claim for the $13,000 balance of the note. The conclusion announced by us in the first division would apply also to the payment of this balance, but for the fact that the estate had become involved  in adverse claims, before the making of final payment. The payment of $10,000 was made on this balance on February 16, 1925. The Commercial Savings Bank closed its doors on January 2, 1925. The collateral therefore had lost its value before February 16, 1925. Though the estate had lost heavily by the failure of the bank, that of itself would not render it insolvent. On the face of the inventory, it would reduce the assets by $60,000. If disaster had stopped at that point, it would have still left the estate clearly solvent. But the affirmative liabilities incidental to the bank failure, which are represented by the two claims of Andrew and Waterbury, did render the estate insolvent. Whether, therefore, the payment of the $13,000 could be deemed an expenditure for the benefit of the estate, within the holding in Division I hereof, is a question which we pass without deciding it, and without further consideration. The district court sustained the right of the bank to retain this payment. It is from that part of the decree that the plaintiffs appeal. This claim was approved on January 22, 1924, both by the administrators and by the court. It was, therefore, clearly established as a claim of the fourth class. It was the only claim filed against the estate, and so continued until after the expiration of the twelve-month period. On January 22, 1924, simultaneously with the presentation and allowance of the claim, the administrators made application to the court for authority to take up the note of the decedent by a renewal

note, to be signed by the administrators themselves. This application was granted according to its terms. The administrators acted under the order, and executed their note, as such, for the debt. What was the character of the new note in relation to the estate? Was it requisite that such new note should be filed as a claim against the estate? The order of the court authorized not simply one renewal note, but successive renewal notes, without limitation. The reasons given in the application were that the administrators desired to avoid the necessity of sale of the collateral, and desired to make payment out of other proceeds of the estate, as they should be collected later. The order of the court did not contemplate that the renewal note, or any successive renewal note, should be deemed a claim, to be filed. Some effect must be given to this transaction. The apparent effect thereof was to authorize the administrators to pay this note as a prudent expenditure for the benefit of the estate. They did pay the note of the decedent, in the sense that they retired it and gave their own notes, instead. The implication of the court order was that the renewal note should be payable out of the moneys of the estate, as soon as they could be realized. If such was not the meaning of the order, then it meant nothing. That such was the intent and meaning thereof was further indicated by the later proceedings.

On January 7, 1925, the administrators made application under the provisions of Section 11940, for authority to mortgage certain lands of the estate for the purpose of paying this debt.  The application was granted by order of the court, mortgages were executed, and the proceeds thereof were used in payment of the renewal note of these administrators. The plaintiffs challenge the validity of the payment of these proceeds to the discharge of this indebtedness because the court order did not, in terms, direct such payment. Section 11940 is as follows:

"11940. *Borrowing money.* If the court is satisfied that it will be for the best interest of the estate that the real estate shall be withheld, it may, upon the application hereinbefore provided for, order the executor or administrator to borrow money thereon, and execute a note or notes in the name of such officer, secured by mortgage on any real estate belonging to the

estate not exempt as a homestead, to secure the payment thereof, and with *the proceeds pay the debts shown in the statement set out in the application, and report his action therein to the court.*"

It will be seen from the foregoing that the purpose of the mortgage must be stated in the application, and that the proceeds of the mortgage, when received, must be devoted to the debt set out in the application. The granting of the application by the court by necessary implication granted the same for the purpose specified in the statute. The fact that the terms of the statute were not incorporated in words in the order is not material. The proceeds of the mortgage were applied strictly in accordance with the terms of the statute. Such application was also responsive to, and in harmony with, the proceedings of January 22, 1924, pursuant to which the renewal note was executed by the administrators. It must be said, therefore, that the proceeds of the mortgage were properly applied by the administrators to the payment of this particular debt.

IV. The foregoing recitals cover the history of the administration up to February and June, 1925. Up to that time, the present claimants, Andrew and Waterbury, had not obtained  any standing as claimants against the estate. They did later obtain such standing, pursuant to Section 11972. Andrew obtained such standing on February 5, 1926, and Waterbury on March 17, 1928. The establishment of these two claims rendered the estate insolvent. Upon the establishment of these claims, the question arose as to what their rights were as to proceedings already had, and as to payment of claims already made. They suffered no discrimination after they acquired a standing as claimants. Were they entitled to reopen all the proceedings of administration? Were they entitled to a recaption of all payments that had been made, in order to put them in hotchpot for the purpose of a new distribution?

The argument in their behalf naturally is that, having established themselves as fourth-class claimants, they stand on an equality with all other fourth-class claimants, and on an equality with the defendant bank, as the only other fourth-class claimant. That they may take and apportion, as between themselves, all of the estate which has not already been appropriated in good faith

to other claims, is conceded to them. Are they entitled to stand where they would have stood, if their fourth-class claims had been established within twelve months? Neither our statute nor our decisions afford us very definite light on this question. In no previous case have we ever recognized the right of recaption to a claimant thus belated. Nor, on the other hand, have we ever expressly refused such right. The implications of our previous cases are: That the door of relief provided in Section 11972 will not ordinarily be opened at all, if the estate be insolvent; that the claimants who had filed within six and twelve months, respectively, should be entitled to maintain their statutory privilege; that, though the later claimant be admitted under the saving clause of the statute, he is yet to be considered somewhat as a belated dinner guest, who may be received cordially to a seat at the second table.

In the *Harsh* case, supra (94), we said:

"It is not the policy of the law to render solvent estates insolvent by the allowance of claims filed after the expiration of the year. As has been said, the depositors, before defendants' claims were filed, had the right, under the order of July 9, 1923, to have their deposits paid. It was the duty of the administratrix to pay them. Nothing more could be accomplished by going through the empty formality of filing claims. The present proceeding was transferred to equity. Defendants do not argue their exception to the transfer. The case is before us in equity. If it were in probate, its determination should be governed by equitable considerations. *Mock v. Chalstrom,* 121 Iowa 411. There is nothing in the record to charge depositors with notice of the existence of defendants' claims. It is inconceivable that, if the undisclosed claims of the defendants had been known to the court, the order of July 9, 1923, would have been made, or, if made, that depositors would have put their money in the bank. $234,816.67 has been paid out on the faith of the order, and cannot be recovered. $208,845.63 of depositors' money was put in the bank, and the depositors' equities on account thereof cannot now be adjusted. Defendants were admitted as fourth-class claimants, for the equitable reasons asserted in the *Nichols* case. While defendants are, in form, on the defensive, they are asking that the order allowing plaintiffs' claims be set aside, and, in substance, that the order of July

9, 1923, and the rights of depositors acquired under it, be dissolved. This is essential to the reduction of depositors' claims to the level of that of defendants, or to a lower level. Defendants are appealing to the equitable powers of the court.''

In *Nichols v. Harsh,* 202 Iowa 117 (128), we said:

''The relief granted in cases of this kind is made by statute to depend upon 'peculiar circumstances,' entitling the party to equitable relief. No element of estoppel is involved herein; the rights of no other parties have intervened because of any act on the part of appellant; the estate is unsettled and open for proper distribution among the legitimate creditors; there is no contention that appellant's claim is not valid; and the estate appears to be solvent. In view of all of the facts and circumstances disclosed by this record, we are constrained to hold that appellant has established such peculiar circumstances as, under the record, entitle him to the equitable relief of being allowed to file his claim against said estate, notwithstanding the bar of the statute of limitations.''

The foregoing is sufficiently illustrative of the attitude of our previous cases towards a belated claimant under Section 11972. To hold now that such a claimant is entitled to a redistribution of the property of the estate and to the nullification of all previous payments made would, in our judgment, reverse the policy of the statute as we have heretofore construed it. Indeed, we think that such a course would be highly inequitable, rather than equitable. It would serve simply to lift from such a claimant the misfortune that had fallen upon him and to transfer the same to innocent shoulders. There is a natural limit to the scope of equity. Neither charity nor generosity is within its field. It is not its function to transfer misfortune from one innocent shoulder to another equally as innocent. As between innocent parties, it is not inequitable to allow misfortune to rest where it falls,—hard though it be.

The proceedings had in this administration have been at all times in the best of faith on the part of the administrators, as well as on the part of the defendant claimant. None of them are responsible for the after events which resulted in the Andrew and Waterbury claims. They were not chargeable with the duty to discover the probability or the possibility of such events.

Equity requires that the procedure had, be deemed an accomplished fact, and that the settled rights of the parties shall not be disturbed by the subsequent claims.

V. There is one other branch of the appeal, wherein the defendant appealed from the order of the court refusing to it a remedy over against the administrators personally. In view of our foregoing conclusion, we have no occasion to consider this branch of the appeal.

The decree of the district court will, accordingly, be *reversed* on the defendant's appeal, and *affirmed* on the plaintiffs' appeal.

All the justices concur.