ST. PAUL MERCURY INDEMNITY COMPANY of St. Paul, Minnesota, et al., appellants, v. LAURA K. NYCE, individually and as administratrix of estate of EARL H.. NYCE, appellee.

No. 47569.

(Reported in 41 N.W. 2d 682)

MARCH 7, 1950.

Boardman, Cartwright & Druker, of Marshalltown, and Oral S. Swift, of Des Moines, for appellants.

Haupert & Robertson, of Marshalltown, for appellee.

BLISS, C.J.—For several years prior to September 10, 1946, Earl H. Nyce was cashier, director and teller of the Fidelity Savings Bank, a state bank, of Marshalltown, Iowa. Shortly before the opening of the bank in the forenoon of that day, and just after he had come from the post office with the mail, and while attending to his bank duties at his cage, he collapsed and died. One of his duties was to have charge of; and the responsibility for, the cash vault of the bank. This vault was a separate compartment of the built-in vault, shut off from the other compartments by bars and a locked door. The cash was kept in three safes, each with a separate time lock in this separate compartment. Nyce carried the keys to the cash vault and wound and

set the time locks. He had charge of distributing the cash to the cages and attending to the placing of the cash in the vault at the close of each day's business. Two of the cash safes were opened every day, but the Mosler safe was set for three days, since it was used entirely as reserve.

An examining committee from the board of directors counted the cash in the vault four times a year. The last count before the death of Nyce was in June 1946. Examiners of the State Banking Department counted the cash annually. The last time was in August 1945. At no count was a shortage found.

After the death of Nyce and on the same day, all the cash was counted except that in the Mosler safe, on which the time lock was set for September 12, 1946, on which day the cash in it was counted. The shortage was found to be $78,504.27. To this was added an item of $250, being a check which Nyce, as treasurer of the Marshalltown Recreation Club, had drawn payable to C. E. Wicklund. Without the latter's endorsement the check had been cashed, but not by Wicklund, and he stated he had received no money on the check. Adding this item to the cash shortage made the total defalcation the sum of $78,754.27.

The plaintiffs are both corporate surety companies, engaged in the business of indemnifying banks against loss through any dishonest, fraudulent or criminal acts of their officers and employees. The Mercury Indemnity Company, by its policy issued to the Fidelity Savings Bank, insured it against such losses up to $50,000. The National Surety Corporation, by its policy for $100,000, insured against such losses, but only in such amount as exceeded $50,000. In other words, the first-named company had the primary coverage of $50,000, and the second carried only the coverage in excess of $50,000. Having paid the loss to the insured bank as provided in their respective policies, the plaintiffs make their claims against the estate of the alleged defaulter, under the principle of subrogation, and as subrogees of the bank, with respect to any and all rights it may have held against the deceased and his estate, because of the defalcation.

Under neither policy did the bank have what is known as "misplacement, mysterious, unexplainable disappearance coverage." It had coverage against loss because of dishonesty of employees—things directly chargeable to employees of the bank.

Misplacement, mysterious, unexplainable disappearance coverage is a type which a bank can buy in connection with that bond which insures against loss that is not traceable to dishonesty of the employees or larceny from the outside .or burglary. The absence of this particular coverage is strongly urged by plaintiffs as a cause for their delay in filing their claims against the Nyce estate. We will refer to it later.

On September 20, 1946, the bank notified each surety company by registered mail of the loss. Each promptly sent a lawyer to Marshalltown to investigate. Mr. Meagher, of St. Paul, came for the Mercury Company and Mr. Schmidt, from Chicago, for the National Corporation. The first-named, since he represented the company carrying the primary liability, assumed the lead and the burden in the investigation. The bank gave them access to all of their books, records, facilities, and information. They were there three or four days on the first trip. They questioned the officers of the bank and the nineteen employees, they talked to Mrs. Nyce, they examined the estate records of Nyce's parents. They later made several trips to Marshalltown. They called in the aid of the sheriff and the aid of State Bureau of Criminal Investigation. Trips were made to Des Moines to counsel with the chief of the bureau and the services of some of its investigators were procured. They sought the aid of the Federal Bureau of Investigation. Dr. Keeler, of Chicago, of lie-detector fame, came to Marshalltown with his mechanical apparatus, and all of the bank employees submitted to the test therewith. One of them admitted that he had embezzled some of the bank's money and that he was the "pay off" man in some black market corn operation. This set the bonding company investigators off on a new trail on which much time was spent, but the record does not disclose what, if any, information or facts were discovered. In fact the record does not reveal what became of the missing cash or who took or received any of it. The investigation went on for months. Dr. Keeler made a report to the lawyer-investigators of his examinations of all the officers and employees of the bank. The officers of the bank took no active part in the investigation, but gave such aid and information as they could when called upon.

The investigators spent much time in trying to ascertain whether the money "mysteriously and unexplainably disappeared", in which event their companies would not be liable, or whether it was stolen by someone connected with the bank. In an amendment of April 29, 1949, to the application to set aside the order closing the estate, the surety companies state their problem, thus:

"That a vital and important matter which first had to be ascertained by these applicants before said payments were made was the question of whether or not there was any coverage under said indemnifying bonds and whether or not they were in fact under any liability to make payment to the Fidelity Savings Bank thereunder, particularly in view of the fact that said bonds did not include any mysterious disappearance coverage. That it was necessary and vital to make a complete and thorough investigation of the facts in order to determine whether or not there was any liability toward the bank because of the terms of said bonds. * * * That these applicants were under no duty to make any payments whatever until it was reasonable to assume that said shortage was not to be classed as a mysterious disappearance, but was attributable to a particular person or persons."

On or about December 9, 1946, the bank sent written proof and statements of its claim to each surety company, which stated that E. H. Nyce was in control of the cash vault and safes therein. A vice-president of the bank testified:

"The bonding companies instituted the investigations that were carried on. * * * We had contacts with the bonding companies a few times with regard to the missing funds, which was the only way we knew they were continuing any interest in it. The only time we kept in touch with the investigation was when there was something they wanted to ask us or tell us."

Mr. Meagher, as a witness for the Mercury Indemnity Company, testified at length of his investigations. Every time he came to Marshalltown he went by way of Des Moines and talked with Mr. Nebergall and Dell Murray of the Bureau of Criminal Investigation. The investigation was still going on the last time he was there and talked with them on May 6, 1947. He testified:

"Q. When was the first time, Mr. Meagher, that your activity in the matter convinced you that there was coverage under your bond, this bond of the St. Paul Mercury Indemnity Company? A. Well, we had a conference at the home office about two or three days before I came down here in May and we went over the case from one end to the other. I think the company—I was acting for the company—and I think that the company was convinced of the loss and that it should be paid at that time and that is the first time. Q. That was in May 1947? A. That is right. It was just before I came down here and issued the draft which paid the loss. Q. Was there ever any time between the time when you first started your investigation of this matter until May 1947, that the investigation of the matter ever stopped or discontinued? A. To my knowledge it was going on all of the time for the purpose of definitely determining whether one individual of the bank was responsible or more than one, and, if so, who they were; and, equally as important, what happened to the money. Q. You may state whether or not you had any purpose also to ascertain whether or not there was coverage? A. There was a problem which I was seriously considering, and my client seriously considered right up to two days before we paid the money. Q. What was the exact date of the payment of the loss, if you know? A. I believe the draft was issued on the 6th of May, 1947. That is right. That is the date of the draft, the date of payment to the bank. I drew the draft right at the bank in the amount of $50,000 and delivered it to them on that day. * * * The day before I issued the draft in payment of the loss I went over the matter with Mr. Nebergall and Mr. Murray of the State Bureau of Investigation. *They brought me up to date on the investigation up to that time and they hadn't found anything.*" (Italics ours.)

This witness testified on April 28, 1949, and so far as the record shows "they hadn't found anything" up to that date.

The National Surety Corporation gave the bank its draft of $28,754.27 for the excess loss on May 15, 1949. Its attorney, Mr. Schmidt, spent considerable time in Marshalltown and was active in the investigation. He testified:

"The purpose of all this investigation was to determine what loss, if any, and who was responsible for the same, and also to attempt to recover any funds that might be recoverable, and also to determine whether or not this was a loss that would be recognized by the bonding companies as one that was caused by an employee as distinguished from mysterious unexplainable disappearance, because the bank had no coverage that would afford it relief on an unexplainable disappearance."

During the period of investigation the administration of the estate of Nyce was proceeding. On October 19, 1946, Laura K. Nyce was appointed administratrix and qualified and on the same day gave notice, by posting, of her appointment, and to all creditors of the decedent or of his estate. Mr. Schmidt testified that he learned of the opening of the estate in October 1946 and talked with Mr. Robertson, the attorney for the administratrix at that time, and requested a copy of the inventory, which Mr. Robertson later sent to him. On December 6, 1946, Mr. Schmidt wrote to Mr. Robertson, stating:

"When I last spoke to you, you indicated you had had Mrs. Nyce appointed administratrix of her husband's estate, and stated you were preparing an inventory and would forward same. This has not yet been received. A copy of this letter is being sent to Mr. Meagher, who, I am certain, will contact you if he is in Marshalltown."

A notation, typed on the original letter, notes the sending of a copy of it to Mr. Meagher.

On December 10, 1946, Mr. Robertson wrote Mr. Schmidt enclosing a copy of the inventory, and stated: "I will be interested in going over this matter on the occasion of your next visit here."

The bank knew that the estate of E. H. Nyce had been opened and was pending. The bank's legal counsel, Mr. Mote, was a member of its board of directors, and knew of the entire situation. Mr. Berkley, a vice-president of the bank testified:

"I did not pay any particular attention to the estate of Earl H. Nyce as it went into the process of administration. My interest laid, as far as the claim was concerned, outside the scope of the E. H. Nyce estate, and that was the attitude the bank took."

Mr. Mote was notified immediately after September 10th of the shortage. He was down there frequently regarding it. He handled all legal matters in connection with the claim so far as the bank was concerned."

The bank filed no claim against the Nyce estate. It is conceded by all parties that on April 19, 1947, Laura K. Nyce, as administratrix of the estate of Earl H. Nyce, deceased, filed her final report and application for discharge, and on the same day her report was approved and she was discharged as administratrix, and the estate was fully and finally closed on said date. No notice of the filing of this report or of the closing of the estate was given to either plaintiff.

Prior to May 26, 1947, so far as the record shows, the plaintiffs had retained no Iowa counsel. According to the professional statement to the trial court by Oral S. Swift, a lawyer of Des Moines, he was retained by the National Surety Corporation on that date, and on the following day he went to Marshalltown and examined the file in the estate of Earl H. Nyce, and interviewed the officials of the bank and Mr. Mote, its attorney. On or about June 6, 1947, he conferred with Mr. Druker, of the firm of Boardman, Cartwright & Druker, and asked him to be associated with him in all matters connected with the investigation. Mr. Swift was retained by the Mercury Indemnity Company about three or four days after he had been retained by the National Surety Corporation. He was instructed by the latter company to look into the matter of salvage against the "Nyce interests."

Mr. Druker made a professional statement to the court of his connection with the matter, and of his first discussion about it with Mr. Robertson, about June 10, 1947, and of several similar discussions later, some of which involved a possible settlement. Realizing that there was little probability of a settlement, he informed Mr. Swift of that fact on July 17, 1947, and on July 29, 1947, they filed the application for plaintiffs, asking the reopening of the Nyce estate, and also filed a statement of their claims.

In plaintiffs' application of July 29, 1947, the only grounds alleged for the reopening of the estate were the validity of their claims and the premature closing of the estate at 2:49 in the

afternoon of April 19, 1947, without notice thereof to plaintiffs. On September 24, 1947, plaintiffs amended their application by alleging as "peculiar circumstances entitling them to equitable relief", under section 635.68, Code, 1946, that: in addition to the fact that no notice of the closing of the estate was given to plaintiffs, there was also no such notice to the bank to whose rights they had become subrogated; the administratrix well knew of plaintiffs' claims, and the precipitate closing of the estate was with intent on the part of the administratrix to bar and cut off plaintiffs' claims, and was a part of a design, scheme and purpose on her part to avoid payment of the claims and presentation thereof on their merits; the nature of the claim required a long investigation, and every day of delay was due to the fact that the bank and the plaintiffs desired not to file a claim until every possibility had been explored which might tend to absolve decedent and his estate from responsibility, and avoid stigma to the decedent's name; the estate had been in no manner harmed by the delay; plaintiffs, after thorough investigation, paid the amount of the shortage without unnecessary delay, negligence, laches, oversight or inattention; that without oral agreement between opposing counsel the claim would have been filed within less than three months from the purported closing of the estate; and, in addition to other grounds, that the estate be reopened under and by virtue of section 638.11 of the 1946 Code of Iowa. No proposition for reversal is relied upon with respect to the Code section just mentioned, and we will take no further note of it.

On April 29, 1949, plaintiffs amended their original application by striking therefrom paragraph 1, to wit: "That they have a claim against the above named estate, which claim accrued prior to the death of the decedent, Earl H. Nyce", and by substituting therefor the following: "1. That they have a valid claim against the above named estate, which claim is based upon the matters set forth in their statement of claim herein. 2. For other and further amendment to said application these applicants state that they in fact had no accrued claim or right to urge a claim against Earl H. Nyce or his estate until after they had made payment under the indemnifying bonds mentioned in their statement of claim herein and hence no right or standing, until

such payment, to institute any proceedings whatever." The said amendment then continues with the quotation hereinabove set out asserting the necessity of ascertaining that the money had not mysteriously and unexplainably disappeared.

Defendants filed a resistance and amendments thereto to the application and its amendments, alleging: a denial that the estate was prematurely closed; admitting the posting of the notice of the appointment of the administratrix on October 19, 1946, and the closing of the estate at 2:49 p.m. on April 19, 1947, and that no notice of said closing was served on the claimant-applicants, but averring that all of the statutory requirements with reference to the closing of the estate were complied with, and that applicants were not claimants against the estate at that time; that, with respect to the alleged understanding or agreement between opposing counsel that the applicants might delay filing any claim they had after the estate was closed, the defendants averred that attorneys for claimants on or about June 11, 1947, told attorneys for defendant of their intention to file a claim on the ground that the estate was closed one day prior to the expiration of time allowed for filing claims, and for the further reason that no proper notice of the closing of the estate had been given claimants; that attorneys for claimants said that the estate could be reopened for a day and again be closed; that attorneys for defendants replied that no such proceedings would be attempted; that no further agreements with reference to said estate were solicited by attorneys for claimants and no agreements were reached; that applicants had no valid claim against the estate and none had been established; that the bank and its officers and attorney had full knowledge of the appointment of the administratrix, who carried her account as administratrix with said bank and conducted all business of the estate through said bank, and were fully informed of the condition and proceedings of the estate; that claimants had knowledge of the opening of the estate and the appointment of the administratrix, and were furnished a copy of the inventory, and their failure to file a claim was of their own volition and not as a result of extraordinary or unusual circumstances; and that claimants have alleged no grounds entitling them to relief under section 638.11, Code of 1946, but are barred by its provisions.

Trial was had to the court. Before all parties rested the following waiver was put into the record: "Applicants waive rights against anyone receiving any payments of claims against Earl H. Nyce, deceased, it being intended only to reserve the rights of applicants against the distributees in the estate of property remaining in the estate as shown by the final report."

Earlier in the trial it had been stipulated that the files in the Nyce estate might be considered by the court without any objections to their admissibility, and the court might take judicial notice of each and every part thereof. These files are not before us and no part is shown in the printed record except as noted herein. There is nothing before this court indicating the value or character of any of the assets of the estate of Earl H. Nyce at any time.

The findings and order of the trial court state:

"This matter is before the court on an application in probate * * *. The merits of the claim are not involved in this hearing. * * * The following statement of facts found by the court will present the issues: The decedent died September 10, 1946, administration was duly taken on his estate and the administrator's notice published on October 19, 1946. On April 19, 1947, a final report was filed showing full settlement of the estate and on the same day the report was approved and administrator discharged and estate closed. * * * The claimants had furnished to the bank fidelity bonds covering its officers generally. On May 6, 1947 and May 15, 1947, the claimants had paid to the bank the loss of the bank upon their bonds, and by the terms of the bonds became subrogated to the claim of the bank against the estate. The claimants filed their claim against the estate on July 29, 1947, together with their application now on hearing.

"Both the bank and the claimants knew of the loss of the funds by the bank in charge of decedent and of the administration of his estate long before the time for filing claims against the estate had expired.

"In the circumstances, whether the estate was properly closed on April 19, 1947, or whether the closing of the estate was premature and the claimants are in a position to complain of the fact that the closing of the estate was premature, in either case the issue is whether or not the claimants have shown pe-

culiar circumstances entitling them to equitable relief as against the bar laid down in Code section 635.68, or to relief for fraud and mistake under section 638.11, as claimed in the amendment to the application. The court * * * reaches the following conclusions:

"1. The claimants have no greater right to a reopening of the estate and a delayed filing of their claim than was possessed by the bank at the date the subrogation became effective.

"2. No circumstances have been established by the proofs that are sufficient to show that the bank retained or had on April 19, 1947, any equitable right to file any claim against the estate.

"3. There is no evidence sufficient to show that either the administrator [administratrix] or her counsel, or any beneficiary of the estate or counsel for such beneficiary has deceived or misled the said bank or the claimants by any acts or representations to their prejudice.

"Accordingly, it is the order of the court that the application of the claimants is denied upon each and every ground therein contained."

Plaintiffs rely upon two propositions for reversal:

"1. The six months period for the filing of claims has not expired. The order of court closing the estate of Earl H. Nyce was prematurely entered on the last day of the sixth month after notice to creditors was given, and, therefore, the statutory time for filing appellants' claim is suspended and has never expired. Time will not expire until the estate has been reopened and timely proceedings are of record closing it.

"2. Facts shown by the record constitute peculiar circumstances that entitle appellants-claimants to equitable relief in the matter of time to be allowed for the filing of their claim, and, therefore, the order closing the estate should be set aside for the purpose of allowing this claim, if none others, to be considered upon its merits."

We note certain statutory provisions which have bearing upon the determination of both propositions.

I. Priority in the payment of demands against the estate of a deceased person is fixed by statute. After the payment of

administration expense, the charges for the last sickness and funeral of the deceased, and the allowance for the widow and minor children, section 635.66, Code, 1946, provides that other demands shall be payable in the following order: 1. debts preferred under Federal laws; 2. public rates and taxes; "3. Claims filed within six months after the first publication or posting of the notice given by the executors or administrators of their appointment."

Section 11972, Code, 1939, was so modified by chapter 301 of the Laws of the Forty-ninth General Assembly that it appears thus as section 635.68, Code, 1946:

"When claims barred. All claims not filed as hereinbefore provided [section ·635.66], within six months from the giving of the notice aforesaid, will be barred, except as to actions against decedent pending in the district or supreme court at the time of his death, or *unless peculiar circumstances entitle the claimant to equitable relief.*" (Italics ours.)

Section 4.1, Code, 1946, provides:

"In the construction of the statutes, the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the general assembly, or repugnant to the context of the statute: * * *

"11. *Month* * * *. The word 'month' means a calendar month * * *.

"23. *Computing time.* In computing time, the first day shall be excluded and the last included, unless the last falls on Sunday, in which case the time prescribed shall be extended so as to include the whole of the following Monday."

Proposition 1. April 19, 1947 was Saturday. The notice of the appointment of the administratrix of the estate· of decedent, being by posting on Saturday, October 19, 1946, was completed on that day. By excluding that day, as required by Code section 4.1 (11), (23), supra, the six-month period for filing claims, as provided by Code section 635.66(3), expired with the last infinitesimal moment of April 19, 1947, just nine hours

and eleven minutes after the estate of Earl H. Nyce, deceased, was closed and its administratrix was discharged.

The method of computing time in the construction of statutes as required by Code section 4.1(11), (23), supra, has been a provision of every Code of Iowa, from the first to the last, both included. The same method has been quite uniformly used in computing periods of time in contracts and other instruments and proceedings. For many years in England and in this country there was much uncertainty in the computing of time, which arose from the differing views as to whether the first or last day or both should be excluded. · The statutory method controls in this state, unless it conflicts with the specific legislative intent as manifested by the language of the statute. Occasionally this court may have used the statutory method though contrary to the plain intent evidenced by the statute construed (Consolidated Ind. Sch. Dist. v. Martin, 170 Iowa 262, 152 N.W. 623) or disregarded the statutory method by excluding the last day (First Trust Joint Stock Land Bank v. Terbell, 217 Iowa 624, 627, 252 N.W. 769). But this court, in computing periods of time fixed by statute or by proceedings thereunder, has uniformly complied with the statutory method, unless contrary to legislative intent. See Fink v. Fink, 8 (Clarke) Iowa 313; Richardson v. Burlington & Missouri River R. Co., 8 (Clarke) Iowa 260, 261; Wilson v. Knight, 3 (Greene) Iowa 126; Carleton v. Byington, 16 Iowa 588; Teucher & English v. Hiatt, 23 Iowa 527, 529, 530, 92 Am. Dec. 440, 441, 442, in which, speaking of the beginning and termination of the period of redemption from a judicial sale, the court, through Cole, J., said:

"But, in our state, the manner of computing time has been regulated by statute (Code of 1851, section 2513; Revision of 1860, section 4121). * * * Under the Code of 1851, or the Revision of 1860, we are clear in the opinion, that the *first*, or day of sale, is to be excluded, and that the right of redemption, therefore, existed during the whole of the same day of the succeeding year. The sale being made on the 28th day of January, 1860, the right to redeem continued until the last moment of the 28th day of January, 1861. The redemption in this case ('January 28, 1861, 3 o'clock and 40 minutes P.M.') was, therefore, in due time."

See also McLeland v. Marshall County, 199 Iowa 1232, 1252, 201 N.W. 401, 203 N.W. 1; Phelps v. Thornburg, 206 Iowa 1150, 1153, 221 N.W. 835; State v. Smith, 162 Iowa 336, 338, 339, 144 N.W. 32, 49 L. R. A., N. S., 834; Romayne v. Hawkeye Commercial Men's Assn., Iowa, 135 N.W. 735, 737; Bruce v. Pope, 179 Iowa 1161, 1166, 162 N.W. 797; State v. Clark, 145 Iowa 731, 736, 737, 122 N.W. 957; Ritchey v. Fisher, 85 Iowa 560, 563, 564, 52 N.W. 505; Happle v. Monson, 235 Iowa 650–654, 17 N.W.2d 391, and authorities cited; State of Iowa for Use of City of Grinnell v. Carney, 208 Iowa 133, 136, 217 N.W. 472; Town of Danbury v. Riedmiller, 208 Iowa 879, 880, 226 N.W. 159; Des Moines Union Ry. Co. v. District Court, 170 Iowa 568, 575, 576, 153 N.W. 217; Manning v. Irish, 47 Iowa 650–652; McCoid v. Rafferty, 84 Iowa 532, 533, 51 N.W. 24; Clingingsmith v. Jackson Dairy Co., 202 Iowa 773, 775, 776, 211 N.W. 413.

In Citizens Bank of Pleasantville v. Taylor, 201 Iowa 499, 501, 207 N.W. 570, the opinion states that a promissory note dated February 9, 1914, payable on demand, became barred on February 9, 1924. This statement is open to misconstruction. What the author of the opinion no doubt meant was that the note became barred at the last moment of said date. Expressing it with technical correctness, the note became barred at the first moment of the following day. There are similar statements in In re Estate of Fuller, 228 Iowa 566, 569, 293 N.W. 55, and Rohrig v. Whitney, 234 Iowa 435, 436, 437, 12 N.W.2d 866. In Horn v. Anderson, 234 Iowa 1068, 1071, 13 N.W.2d 693, the note by its terms was due on April 17, 1923, and the opinion rightly states that it was barred by the statute of limitations (section 11007(6), Code, 1931) ten years thereafter, or on April 18, 1933. As stated in Happle v. Monson, supra, 235 Iowa 650, 652, the statements noted in those opinions were unnecessary to the decisions since the exact day of the expiration of the statutory limitation was not in issue.

II. The fact that the estate was closed a few hours before the end of the six-month period for filing claims does not aid the plaintiffs. Under the statute they were required to file any claims they had in the office of the clerk of the district court within that period. That was their affirmative obligation and burden. They did not see fit to do so either during that portion of the period preceding the closing nor during the nine hours

and eleven minutes of the period remaining after the closing. The closing of the estate and the discharge of the administratrix did not hinder or prevent plaintiffs from filing any claim during those remaining hours. There is no claim by plaintiffs, nor any evidence in the record, that defendants or anyone interested in or connected with the estate did anything to mislead plaintiffs or delay or prevent them from filing any claim during the six-month period. What plaintiffs did or did not do was of their own volition. Mr. Meagher and Mr. Schmidt talked with the administratrix and the attorney for the estate several times but there is no evidence that they told, or even intimated to, either that they had any claim against the estate or contemplated filing one. There has been no claim made that either of these lawyers did not know the pertinent statutory provisions. It is reasonable to assume that they availed themselves of such little research or inquiry as would have informed them.

Had plaintiffs filed their claims after the closing of the estate and before 12 o'clock midnight of April 19, 1947, their application to reopen the estate would very likely have been granted by the trial court. But they did not do this.

In support of their first proposition plaintiffs rely upon the case of In re Kimball Estate v. Kimball, 1913, 158 Iowa 273, 277, 278, 139 N.W. 456, 457. The facts in that case and the statutory provisions involved are each much different from those in the case at bar. The decision in that case does not justify the reliance which plaintiffs place on it. The executor was appointed on June 19, 1909, and the first publication of the notice of his appointment was on July 3, 1909. He filed his final report on June 18, 1910, and was discharged as executor the same day. The twelve-month period for filing claims did not expire until midnight of July 3, 1910. On July 2, 1910, and within the twelve-month period, claimant filed his claim and on the same day served notice thereof on the executor. The claimant complied fully with the statute insofar as he was able. He filed his claim in the clerk's office within the twelve months and also served notice of hearing on the claim within the same period, although the executor was then discharged. On October 21, 1910, claimant commenced action to set aside the order approving the final report and granting the executor's discharge. A demurrer

to the petition was sustained. This court reversed. It was conceded that the executor was discharged before the period for filing claims had elapsed. In the interim between the termination of that period and the prior closing of the estate claimant had filed his claim. He served notice upon an executor who had already been discharged. We said:

"As a rule, every claimant must file his claim within one year from the time of the first publication of notice, and if the claim is not allowed by the executor he must give notice of the filing to the executor. * * * Unless there be an executor vested with authority to allow the claim, or upon whom notice may be served, it is manifest that the statute cannot be complied with. An executor who has been fully discharged by order of court has no authority to allow claims, and notice served upon him after his discharge would be of no effect. A claimant's remedy in such cases would be by timely action to have the order of discharge set aside, and then immediately to file his claim and have it allowed, or to give notice to the executor. In other words, the statutory time for the filing of claims is suspended during the time the premature order of discharge remains of record."

Upon the authority of this decision, plaintiffs contend that since the Nyce estate was closed before the period for filing claims had elapsed "the statutory time for filing appellants' claim is suspended and has never expired." This case involved section 3348, Code, 1897 (section 635.66, Code, 1946) and section 3349, Code, 1897 (section 635.68, Code, 1946), both of which were substantially modified by chapter 301, Acts of Forty-ninth General Assembly. This modification struck from section 3348, supra, the line, "4. All other debts;", thus eliminating claims of the fourth class.

Chapter 301, section 2, supra, modified section 3349, set out below, by striking from it all of the parts which we have italicized, to wit:

"Sec. 3349. Limitation. All claims *of the fourth of the above classes,* not filed *and allowed,* or *if filed and notice thereof,* as hereinbefore provided, *is not served* within *twelve* months from the giving of the notice aforesaid, will be barred, except as to actions against decedent pending in the district or supreme

court at the time of his death, or unless peculiar circumstances entitle the claimant to equitable relief."

After striking the word "twelve", the word "six" was substituted.

Under sections 3348 and 3349, construed in the Kimball case, any unfiled and unallowed claim of the fourth class, to escape being barred, must not only have been filed in the clerk's office within twelve months after the notice of the administrator's appointment, but also notice of a hearing on said claim at a regular term of court must have been served on the administrator within the twelve-month period. But after the adoption of chapter 301 of the Laws of the Forty-ninth General Assembly, claims of the fourth class against the estate of a decedent were eliminated, and all claims were limited to those of the third class, and they were required to be filed in the clerk's office within six months after the first publication of the notice of the executor's or administrator's appointment, but without any requirement for serving notice of a hearing on the claim upon the executor or administrator within said six-month period. These provisions are now found in section 635.68, Code, 1946. Consequently plaintiffs could have fully protected their rights by merely filing any claim they had, in the clerk's office, within the six-month period either before or after the closing of the estate.

Because the claimant in the Kimball case filed his claim within the period limited by the statute then in force, which the plaintiffs did not do in this case, and because of the difference in the statutory proceedings, the decision in the Kimball case does not aid the plaintiffs.

III. Were there peculiar circumstances entitling plaintiffs to equitable relief under section 635.68, Code, 1946? This proposition has been presented to the courts a great many times. There is no general rule to guide the court. Each case must be determined by its particular circumstances. We have fully and fairly stated those involved herein. They amply sustain the trial court's conclusion that plaintiffs were not entitled to the relief prayed for. They were promptly notified of the loss by the bank and given access to all available facts. They were naturally interested in absolving themselves from any liability. Much of their investigation and a large part of their time were devoted

to that end—seeking to establish and to convince themselves of the fantastic and most unusual fact that over $78,000, in currency and specie, had in some mysterious and unexplainable manner vanished and disappeared from the cash vault, safes and cages of the bank without the dishonesty of any person connected with the bank. It is not strange that they did not succeed although they persisted for over six months in their attempt. They, of course, did not wish to hastily charge any employee of the bank with wrongdoing, but that is not a peculiar circumstance entitling them to equitable relief, under the record in this case.

The court found that plaintiffs had full knowledge of the administration proceedings. Mr. Schmidt learned of the administration in October 1946 and had been given a copy of the inventory by Mr. Robertson in December following, and his letter indicates that he had informed Mr. Meagher. They had examined the estate files of the parents of Mr. Nyce in the clerk's office and had some knowledge of administration proceedings.

While both Mr. Schmidt and Mr. Meagher testified that they were first convinced of liability under their policies early in May 1947, the testimony of Mr. Meagher was on redirect examination, after he had said on cross-examination that: "I suspected that Earl Nyce was involved almost from the very first."

As we have stated, plaintiffs contend that they were uncertain and in doubt whether they were liable to the bank under their policies because of the fact that they could not ascertain with reasonable certainty whether the missing funds were misplaced or mysteriously disappeared, or whether they were wrongfully taken by someone connected with bank for whose fidelity they were surety. Their position is that they could not enforce their claims against the Nyce estate until they indemnified the bank for its loss, and that they were not required to do this until they had determined their liability. It is true that their right to be subrogated to the rights of the bank against the estate and to enforce those rights required them to first pay the bank. But that does not mean that they could not have filed their claims against the estate within the six-month period and before they paid the bank. Of course, it was essential to their right of recovery that they establish the payment of the bank's loss, but it was not necessary that they do that within the six-

month period. They could prove their claim after that period had terminated.

If plaintiffs' liability to the bank and their right of subrogation to all rights of the bank against the Nyce estate were contingent upon something which might or might not happen, nevertheless section 635.61, Code, 1946, provides that: "Contingent liabilities must be presented and proved, or the executor or administrator shall be under no obligation to make any provision for satisfying them when they accrue."

Plaintiffs must be assumed to have known of their rights of subrogation, and that any such right was theirs as substitutes for the bank, and was no greater than the right of the bank, but there is no evidence that they ever asked the bank, whose right of recovery, if it had any, was not contingent, to file a claim against the Nyce estate. They might rightfully file even though the bank did not. Plaintiffs' failure to file within the six-month period can fairly be charged to their lack of diligence or their own intention.

The purpose of the legislature in reducing the time for filing claims against the estates of decedents from twelve months to six months was probably to expedite the closing of such estates. Plaintiffs, not having filed any claim, and not having indicated an intention to do so to the administratrix or to the attorneys for the estate, and not having made known any interest in the estate, the defendants were under no legal obligation to give notice of the application to close the estate and discharge the administratrix.

The burden was on plaintiffs to establish the defense relied upon in their proposition 2, either by showing diligence in the matter or justification for the lack of diligence. The trial court, by its order, held that they had failed in each respect and we think it rightly so held. There are no allegations of any facts in plaintiffs' application or amendments to it of what generated the belated conviction in their minds that they were liable under their policies, or that they had a rightful claim against the estate of Nyce. There is no evidence that the administratrix or the attorneys for the estate hurriedly closed the estate with an intent, or as a part of a fraudulent scheme, to defraud plaintiffs, or to deprive them of an opportunity to file or establish any

claim they may have had. Citation of decisions are unnecessary, but see Des Moines Transportation Co. v. Haring, 238 Iowa 395, 27 N.W.2d 210; Chicago & N. W. Ry. Co. v. Moss, 210 Iowa 491, 231 N.W. 344, 71 A. L. R. 936; Taylor v. Jackson, 213 Iowa 844, 239 N.W. 519; Doyle v. Jennings, 210 Iowa 853, 229 N.W. 853; In re Will of McPheeters, 233 Iowa 199, 204, 8 N.W.2d 588; Federal Land Bank of Omaha v. Bonnett, 226 Iowa 112, 116, 284 N.W. 97; Anderson v. Storie, 208 Iowa 1172, 1178, 227 N.W. 93, 66 A. L. R. 1410; Simpson v. Burnham, 209 Iowa 1108, 1110–1112, 229 N.W. 679.

IV. This cause below was in probate, and was tried by the court as a law action. The fact that section 635.68, Code, 1946, requires the court to determine whether peculiar circumstances entitle a claimant to equitable relief does not mean that the hearing is in equity or that the cause is reviewable anew on appeal. Such relief can be administered in a probate court without the aid of a court of conscience. In re Estate of Mikkelsen, 202 Iowa 842, 848, 211 N.W. 254, 256; In re Estate of Sheeler, 226 Iowa 650, 661, 284 N.W. 799. It is stated in Peterson v. Johnson, 205 Iowa 16, 20, 212 N.W. 138, 140:

"Under the repeated holding of this court, equitable relief in such cases must be granted by the court. In hearing and passing upon peculiar circumstances, the court applies equitable rules, and the relief granted is, in the language of the statute, equitable in its nature." (Citing cases.)

See also Elliott v. Des Moines Nat. Bk., 209 Iowa 1258, 1269, 228 N.W. 274; Mock v. Chalstrom, 121 Iowa 411, 96 N.W. 909.

It is our conclusion that the order of the district court appealed from has substantial support both in the evidence and the law. It is therefore—Affirmed.

All JUSTICES concur.