## FRED SMITH v. STATE.

No. A-10162.     Oct. 4, 1944.

(152 P. 2d 279.)

S. E. Dunn, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, J. Defendant, Fred Smith, was charged in the district court of Tulsa county with the crime of assault with a dangerous weapon, was tried, convicted, and sentenced to a term of three years in the penitentiary, and has appealed.

All of the errors complained of may be considered under the assignment that the evidence was insufficient to sustain the judgment and sentence.

The charge in this case was under 21 O. S. A. 1941 § 645, which is as follows:

"Every person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots or attempts to shoot at another, with any kind of firearm or air gun or other means whatever, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year."

It is contended that the evidence is insufficient to prove the commission of a felony as alleged in the information, and that there was a fatal variance in the testimony and the allegations of the information. The charging part of the information was as follows:

"* * * that Fred Smith, on the third day of February, A. D. 1941, in Tulsa County, State of Oklahoma, and within the jurisdiction of this court, did unlawfully, wilfully and feloniously, without justifiable or excusable cause, commit an assault with a dangerous weapon upon the person of another, to-wit: Mrs. Charles E. Smith, by then and there kicking the said Mrs. Charles E. Smith with heavy shoes had and worn on his feet, and then and there, with force and violence, striking her with his fist breaking her jaw and otherwise bruising and wounding her, and he the said Fred Smith being a stout, strong young man, and with the unlawful and felonious intent then and there upon the part of him the said Fred E. Smith to do Mrs. Charles E. Smith great bodily harm and injury, * * *."

To sustain this contention, defendant relies upon the cases of Wilcox v. State, 13 Okla. Cr. 599, 167 P. 74; Bourbonnais v. State, 7 Okla. Cr. 717, 122 P. 1131; and Moody v. State, 11 Okla. Cr. 471, 148 P. 1055.

The state relies upon the cases of Clemons v. State, 8 Okla. Cr. 452, 128 P. 739; Parks v. State, 14 Okla. Cr. 413, 171 P. 1129; and Collins v. State, 22 Okla. Cr. 203, 210 P. 285, 30 A. L. R. 811.

We have carefully read all of these cases.

The above section of the statute, together with 21 O. S. A. 1941 § 652, §§ 641, 642, § 653, and § 681, have been the occasion of much consideration by this court from early times. It would probably simplify the administration of justice in this state if the Legislature would pass what has often been denominated as an "aggravated assault" statute; and this, coupled with our "attempt to kill" statute, would in all probability clarify the situation as it now exists. This, of course, is a matter for the consideration of the Legislature, and not for the courts.

Under the decisions above cited, it may be said that the allegations of the information in the instant case are

not in as much detail as they should have been. The record does not disclose that a demurrer or motion to quash the information was filed by defendant, but he entered a plea of not guilty, and was tried with the result as above stated.

Under the law a pair of shoes, such as worn by the defendant, are not a dangerous weapon per se. There can be no question but that by their manner of use they might under certain circumstances become a dangerous weapon; as, for instance, where the evidence revealed that they were used to stomp one to death, or to inflict great bodily injury. The manner of their use would determine the fact as to whether or not they were a dangerous weapon. Some of the later cases decided by this court have discussed this statute. We cite them without quoting therefrom: Palmer v. State, 78 Okla. Cr. 220, 146 P. 2d 592; Tipler v. State, 78 Okla. Cr. 85, 143 P. 2d 829; Bean v. State, 77 Okla. Cr. 73, 138 P. 2d 563; Beck v. State, 73 Okla. Cr. 229, 119 P. 2d 865; Reardon v. State, 51 Okla. Cr. 432, 2 P. 2d 100.

And while the allegations of the information were not as much in detail as they should have been, we would not be justified in saying that they were insufficient, under our procedure, to sustain the judgment and sentence, provided the facts justified.

Under the statute above quoted, the offense of assault and battery was an included offense and the court instructed the jury under this statute.

The evidence in this case revealed that the defendant was married, and he and his wife had separated. She was living at the home of Mrs. Charles E. Smith (no relation to the defendant or his wife) in Tulsa, and had been there since about October 6, 1940. There had been some discussion of a reconciliation between defendant and his wife.

He had talked with her on the evening prior to February 3, 1941, and had at that time taken her out of a car driven by another man, and returned her to the home of Mrs. Smith, telling her he would be back the next morning. He also told her, according to his own testimony, that if he ever caught her with the man again there would be serious trouble. About 8:30 on the morning of February 3, 1941, defendant went to the home of Mrs. Smith, where his wife was staying. His wife saw him coming, and ran into the kitchen, because she was afraid of him. Mrs. Smith went to the door. Her testimony about what happened is as follows:

"A. When she (Juanita Smith, wife of defendant) saw him coming she ran into the kitchen and I went to the door, and he said, 'I come after Juanita and those things.' And I said, 'Fred, Juanita says she isn't going, and she isn't going to let you have the things, and don't come in and create any scene at all; I am ready to go to work, so don't come in.' And he just pushed me aside and he came in anyway. He didn't even touch me, but he came on in anyway, and then when we stopped inside the door, he saw this boy there that came after me. Q. Mr. Donham? A. Yes, Mr. Donham. He was checking up some lamps for me, we were going to take them to be painted at the shop, he was holding one. And he looked at him, and he said, 'So you have an audience, that is fine, I like an audience when I am putting on a show.' Q. Who said that? A. Fred Smith. I said, 'Fred, you are wrong, there is no audience present. Travis came after me like he always does, I have him come after me most every morning.' And I said, 'You are wrong, there isn't anything planted.' And by that time he had told Juanita, Mrs. Fred Smith, he wanted her to get her things ready and get going. She said, 'No, Fred, I am not going with you.' He said, 'Yes, you are, now.' And he told her then that he wanted to get the things, they had some cooking utensils that they had brought back there after Christmas, and they had them

there in my store room. And he told her to get those things. She said she didn't have the key. And he said, 'Well I will get the key.' And she said, 'You will do better than Ralphy and I have ever did, because we haven't had the key for over a week.' That was the key to my little closet, you know. And he said, 'I will take a screw driver and I will break the lock.' I said, 'No, Fred, you are not going to do that, this is my home, and you are not going to break this lock.' I said, 'If you do I will call the police, that is the only thing I can do.' Then he told me if I did he would knock my head off and stomp it on the floor, was the words he used. So I started over to the phone, and I picked up the phone, and he come up and the first lick hit me here in the cheek bone, and it hit me with such force that it knocked the phone from my hand, and he stepped back in the living room and I was in the bedroom where the telephone was. So he was back in the livingroom there, and I went around through the bedroom back to the kitchen and I got a butcher knife and I went and said, 'Now, Fred, don't hit me again,' just like that. And somehow or other I laid the knife down on a little stand in the corner of the room to take my coat off, and when I did he made a dash for the knife and got it. Then he said, 'I don't like you, I will just make a triple killing, kill you all.' And I don't know where—just then it seems like Juanita came in, and looked like he was going to hit me there, and I was about to die with the pain in my eye where he had hit me under that cheek bone. And I told Travis then—that is, Donham, he was standing there—I said, 'Travis, you go call the law.' and he stepped up to Travis and drew the knife up, and said, 'Stand right where you are.' And I said to Travis, 'Don't do a thing.' I didn't want him to get into it with him, I was afraid he would hurt him. Then I walked around back through my bedroom into the front room and went to the front door and out, and I says, 'I will go down the steps, Fred, and call the law.' Fred hollered, 'You come back here.' But I went to my neighbors across the street and asked her to call the law for me. And as I went back in he had the butcher knife in his hand at the time, and had some of

Juanita's clothes laying across his arm, and he said he ought to knock my head off for me, and he would right there, he told me, and that is when he hit me in the jaw and knocked me down, and when he knocked me down he was kicking me, and then Travis laid the lamp down and came running over to him, and they got into it, and they were fighting and that ended our fight."

As to her physical condition, Dr. H. J. Black testified:

"Q. Can you tell the jury whether or not she was suffering from any injuries at that time? (about 9:30 a. m., February 3, 1941, when he examined her). A. Yes, sir. Q. Describe those injuries to the jury, and give the extent of them, please sir. A. The left eye was black and swollen, the left cheek was swollen, and she had a broken lower jaw, through the angle of the jaw on the left side. Q. Were there any other injuries? A. She also had a large bruise over the left hip. Q. Any other injuries that you recall? A. That is all. Q. Now, this injury to the jaw, you say,—doctor—or tell the jury whether or not that is a serious injury. A. Yes, it was. Q. And was it necessary for you to wire the jaw or the bones together? A. Yes, we wired the lower jaw to the upper jaw, so she had to drink for a period of seven weeks."

Travis B. Donham, a witness for the state, and who was present during all of the difficulty, fully corroborated the evidence of Mrs. Smith, as did Mrs. Juanita Smith, wife of the defendant, who had secured a divorce from defendant, and who was placed upon the witness stand by the defendant.

Defendant, as a witness in his own behalf, testified to coming to the home of Mrs. Charles E. Smith, on the morning of February 3, 1941; that Mrs. Smith came to the door, and he asked her, "Where is Dude?" (his wife), and she answered, "In the kitchen." That he walked in and told his wife to get her things, that they were going to leave, and that they could get those things they had

stored in the closet. That his wife said the closet door was locked and she didn't know where the key was, and that she wasn't going to let him have the things they had stored there. She then told Mrs. Smith to let him have the key and let him have them, but Mrs. Smith said, "No, I will not let him have them, I will call the police." That, "she begun cussing me then and calling me sons of bitches, and said she would call the police. She started to call the police and I started to protect myself, and she struck at me and I struck her, hit her upon the cheek bone." That Mrs. Smith then went to the kitchen and returned with a butcher knife, and "she said she would cut my head off if I even got close to her. I got hold of the knife then and held to it until I got outside. She went across the street and had a neighbor call the police. During that time I had my wife to get her things, and had them on my arm, going out the door, when she came back from the neighbors about that time, and met her in the living room. We got to arguing again, and she kept calling me sons of bitches, and I got to the front porch, I lost the knife on the front porch, and I struck her and she went down. Travis Donham hit me from the side, and then he and I started fighting, and wound up on the sidewalk outside." He denied that he at any time kicked the prosecuting witness.

The defendant introduced four witnesses who testified to his good character as a peaceable and law-abiding citizen. They were from Tulsa, and the place where he formerly lived.

It will be noted from the evidence above quoted that the main injury inflicted upon the prosecuting witness was the breaking of her jaw, which was done by the defendant striking her with his fist. There is no evidence

on the part of the state or the defendant that the using of the shoes of defendant was in such manner as to cause them to be considered as a dangerous weapon, in the sense intended by the statute above quoted, and as construed by the decisions of this court.

We have carefully reviewed this record. There can be no condoning the conduct of this defendant toward this elderly woman. According to her testimony, he entered her home without her consent and struck her without justification. However, the act was an assault and battery, according to the evidence. The defendant having been charged with assault with a dangerous weapon which is a felony, the district court had jurisdiction to try the defendant, and having assumed jurisdiction, had the right to submit to the jury the included offense of assault and battery, though this crime is a misdemeanor. Moody et al. v. State, 11 Okla. Cr. 471, 148 P. 1055.

Under the facts as above outlined, we are of the opinion that the judgment and sentence in this case should be modified from the sentence of three years in the penitentiary to a fine of $100 and costs, and 30 days in the county jail, the maximum punishment prescribed by the statute for the crime of assault and battery. Murphy v. State, 61 Okla. Cr. 284, 67 P. 2d 978; Bayne v. State, 72 Okla. Cr. 52, 112 P. 2d 1113; French v. State, 73 Okla. Cr. 141, 118 P. 2d 664.

As so modified, the judgment and sentence of the district court of Tulsa county is affirmed.

JONES, P. J., concurs. DOYLE, J., dissents.