STATE OF IOWA, appellee, v. WILLIAM TYLER BRADLEY, appellant.

No. 50578.

(Reported in 116 N.W.2d 439)

212

JULY 24, 1962.

REHEARING DENIED OCTOBER 16, 1962.

Leo Ballard, of Des Moines, for appellant.

Evan Hultman, Attorney General, John H. Allen, Assistant Attorney General, and J. T. Snyder, County Attorney of Buena Vista County, for appellee.

THOMPSON, J.—On August 29, 1961, the county attorney of Buena Vista County filed in the Buena Vista District Court his information charging the defendant with the crime of assault with intent to inflict great bodily injury, in violation of section 694.6 of the 1958 Code of Iowa; and further charging him with being a habitual criminal as defined by section 747.5. Specific convictions of previous offenses were charged. On September 7 next an amendment to the information was filed, which deleted two of the previous convictions charged and added another. The net result of the deletions and addition was that two previous convictions were alleged in conformity to section 747.5. The amendment also set forth for the first time the names of witnesses by whom the State proposed to prove the identity of the defendant as the same person named in the two previous convictions, and with the name of each was an abstract of proposed testimony. On the same date a notice of the proposed additional testimony was served on the defendant.

To the information as amended the defendant entered his plea of Not Guilty. He was first arraigned on September 6, and again on September 11, after the information had been amended. For some time he refused the services of counsel, and he was in fact not represented until after the jury had been selected on September 11. The record shows that the trial court went to some lengths to advise him of his right to counsel and to urge him to procure the services of an attorney or to permit the court to employ one for him. On September 6, when he was first arraigned, "the court visited somewhat with the defendant attempting to explain to him his rights for counsel and that the court would appoint such counsel for him if he so desired. At that time the court attempted to show the defendant the necessity of counsel in this matter, and why he should either employ able counsel or have the court employ one. He still maintained that he did not desire counsel nor did he want the court to appoint

one. That he was ready, willing, and able to proceed with his own case."

Again, on September 11, the court brought the defendant to its chambers. "He again informed the defendant of his rights to counsel, and tried to explain the importance and necessity for such and urged him in every way within reason and within the discretion of the court to either employ counsel or permit the court to appoint counsel. This was again refused by the defendant and he stated to the court that he did not desire counsel and that he wished to plead his own case. The court then inquired of the defendant whether or not he was ready to go to trial. The defendant stated he was."

I. Against this background the proceedings opened. A jury was selected, "the court attempting in every way possible to preserve all the rights of this defendant, and assist him in every manner to see that he would obtain a fair and impartial trial." The quotations are from the statement of the court as to what occurred preliminary to the commencement of the trial.

After the selection of the jury on September 11, the trial was adjourned until 10 a.m. on September 12. At that time the opening statement for the State was made, and the court advised the defendant of his right to make a statement in his own behalf. The defendant, having apparently thought better, or worse, of his own ability to defend himself, told the court he might desire counsel.

The court then adjourned the case until one p.m. to permit the defendant to decide definitely whether he wished the services of an attorney, and shortly thereafter it received a telephone call from defendant's present counsel, who resides in Des Moines, saying that he had been retained to represent the defendant. Mr. Ballard arrived in Storm Lake about two p.m., and was given time to confer with his client. About three p.m. defendant's counsel returned to the courtroom and filed a motion for a mistrial, which will be discussed. The motion being denied, counsel then requested additional time to familiarize himself with the case, and court was adjourned until September 14 at 10 a.m. The trial then proceeded with evidence for the State pertaining to the primary offense charged in the information.

When this was concluded, the State offered evidence concerning the previous offenses, to which defendant's counsel objected on technical grounds. This objection being overruled, the defendant asked a continuance until September 25 next; but the court granted a continuance only until September 18. This matter will likewise be further considered in a later division. The trial proceeded on September 18, with the result that a jury verdict of guilty of the primary offense was returned, and an interrogatory as to whether the defendant had been twice previously convicted was answered in the affirmative. From judgment and sentence in accordance with the verdict and the affirmative finding of the interrogatory the defendant appeals. Further facts will be detailed as we consider the errors relied upon for reversal.

■■ II. Four errors are assigned. The first concerns a statement made by the county attorney in his opening remarks to the jury. At this time the defendant was not represented by counsel, but was still electing to try his own case although he had been repeatedly advised by the court of his right to an attorney; in fact had been warned that his best interest required that he have such representation. Mr. Ballard appeared for him a few hours after the opening statement for the State had been made, and promptly filed a motion for mistrial based on a remark made by counsel for the State. The objectionable statement as set forth in the motion for mistrial was this: "I want to explain to you that the testimony here will be in reference to the brutal attack on Elmer Enderson. The prior charges are only for the purpose of showing that Mr. Bradley has not adequately reformed due to his prior convictions."

The defendant thinks that reference to him as one who "has not adequately reformed" was so improper and prejudicial that it prevented him from receiving the fair trial to which he was entitled. The trial court did not agree; and we have repeatedly said that it has a considerable discretion in ruling upon such questions. In State v. Harless, 249 Iowa 530, 535, 536, 86 N.W. 2d 210, 213, 214, we discussed a similar situation. There the prosecuting attorney had referred to the defendant as a "professional criminal". While we said there might be some distinction between a "professional" criminal and a "habitual" criminal, we

held the trial court did not abuse its discretion in finding that the defendant had received a fair trial notwithstanding the prosecutor's remark. Authorities are cited; and see in addition thereto, State v. Jensen, 245 Iowa 1363, 1366, 1367, 1368, 66 N.W.2d 480, 482, and State v. Wheelock, 218 Iowa 178, 182, 254 N.W. 313, 316. It is not farfetched to say that one who has been convicted of serious crimes in the past, and is again charged, has not reformed; certainly not to the point that the trial court abused its discretion in refusing to grant a motion for mistrial.

III. Error is predicated on the admission of the testimony of the witnesses who were not listed on the original information but were included in the notice of additional testimony served on the defendant on September 7. Since the trial was set for September 11 and the jury was drawn on that day, the defendant asserts that the four-day notice required by section 780.10 of the Code was not given. These were all identifying witnesses whose testimony was needed in proving the previous crimes. None of the evidence elicited from them pertained in any way to the primary crime.

When the testimony of the first of these was offered on September 15, the defendant objected that four full days had not elapsed from the date of service of the notice of additional testimony until the beginning of the trial. It will be observed that nothing was done on September 11 except the selection and impaneling of the jury. Except for the ruling on the motion for mistrial, nothing further was done until September 14. When objection was made to the testimony of the first of the identifying witnesses offered, the county attorney then filed a motion to introduce the evidence with supporting affidavit, as defined in section 780.11. The court granted the motion and permitted the introduction of the evidence.

The defendant urges that lack of diligence on the part of the State affirmatively appears; and a showing of diligence being required by section 780.11, supra, it was error for the court to sustain the motion and allow the evidence.

In addition to the matter of diligence, questions of waiver, discretion of the trial court, and when a trial commences within the meaning of the statute are argued and disputed at some

length by the opposing parties. The defendant says in his brief: "The present fact situation would appear to be a case of first impression in Iowa." The State has apparently concurred in this view; and so much effort, white paper and printer's ink have been expended in arguing irrelevant questions. The case is not one of first impression.

The defendant properly cites section 4.1(23) as the governing statute. We quote it: "Computing time. In computing time, the first day shall be excluded and the last included, unless the last falls on Sunday, in which case the time prescribed shall be extended so as to include the whole of the following Monday."

From this the defendant draws the conclusion that four clear days must elapse between the date of giving notice of additional testimony and the commencement of the trial. In view of the language of section 4.1(23), supra, we would not be inclined to agree with this interpretation in any event; but the matter has been decided by this court in State v. Clark, 145 Iowa 731, 736, 737, 122 N.W. 957, 959. In that case the notice was given on November 28 and the trial commenced on December 2. We followed the rule of exclusion of the first day and inclusion of the last. Thus there were four days as required by the statute on giving notice of additional testimony, which was identical with our present section 780.10. We counted November 29, 30 and December 1 and 2, the last date being that of the commencement of the trial. In the present case we have September 8, 9, 10 and 11, the final date being the one on which the trial commenced. In State v. Clark, supra, we said:

"We think the argument of the defendant unduly enlarges the statute, and the purpose of the Legislature, in his behalf. That any notice at all of additional witnesses should be required is a matter of legislative grace. No constitutional right is involved therein. The provision of the statute is that such notice must be given at least four days before the day of trial. How these four days are to be counted is expressly pointed out in paragraph 23, section 48, [now section 4.1(23)] of the Code. This provides that the first day shall be excluded and the last included. Under this rule the service of the notice was in time."

State v. Clark, supra, was cited with approval on the iden-

tical point in St. Paul Mercury Indemnity Co. v. Nyce, 241 Iowa 550, 564, 41 N.W.2d 682, 690. The matter is no longer open in Iowa.

The notice having been timely, the questions argued by the parties concerning defendant's second claimed error are moot.

IV. The third assigned error raises the question of the necessity of submission of included offenses. The trial court submitted only the offense of assault with intent to inflict great bodily injury, the major crime charged in the true information. Undoubtedly assault and battery and assault are included offenses in the crime of assault with intent to inflict great bodily injury; and the defendant urges that at least assault and battery should have been submitted for the jury's determination. In State v. Ockij, 165 Iowa 237, 240, 145 N.W. 486, 489, 490, we said: "The court must determine whether there is any substantial evidence of such lower degrees, and, if there is none, it is not error to fail to instruct as to them." In that case no offenses lower than assault with intent to inflict a great bodily injury were submitted, the defendant was convicted of that crime, and we affirmed.

We have considered the question of submission of included offenses in many cases. It was discussed at some length in State v. Leedom, 247 Iowa 911, 917, 76 N.W.2d 773, 777, where we laid down this rule:

"We have repeatedly held that reversible error will not appear because of failure to submit included offenses unless two elements concur: (1) the claimed included offense must be necessarily included in the offense charged, and (2) the record must contain evidence justifying a finding of such included charge rather than of a higher offense."

This was cited with approval in the recent case of State v. Drosos, 253 Iowa 1152, 1165, 114 N.W.2d 526, 533. See also State v. Dean, 148 Iowa 566, 576, 126 N.W. 692, 696; and State v. Hoot, 120 Iowa 238, 247, 94 N.W. 564, 567, 98 Am. St. Rep. 352.

It is then necessary to apply the rule to the facts in the case at bar, to measure the cloth and determine whether it fits. It appears that on the date charged in the indictment, April 22,

1961, one Elmer Enderson, a man 70 years of age, met the defendant and a woman who gave her name in testifying as Phyllis Genevieve Davis, but who seems to have been claimed, or at least referred to by the defendant, as his wife, in a tavern in Alta, in Buena Vista County. There was some drinking there, to the extent that Enderson testified that "I wasn't drunk and I wasn't, you might say, sober." With Enderson in this anomalous condition midway between pollution and purity, the party left the tavern and proceeded in a truck driven by the defendant to what one of the party describes as "the house of a bootlegger". Here Enderson procured a bottle of what is, charitably perhaps, termed in the record as whiskey. They then drove to a filling station in Alta, where defendant left the truck.

What occurred in the truck immediately thereafter is the subject of a disagreement between Enderson and Mrs. Davis. He says she attempted to extract money from his pocket; he wanted to get out of the truck, and "she started to kick me." The Davis woman says Enderson made an indecent proposal to her, and when she refused struck her; she then started kicking him. It is not our function to resolve this controversy; in any event it is immaterial to the issues here.

Whatever happened in the truck, Enderson speedily left it; whether under his own power or with the aid of the applied feet of Davis is uncertain. The testimony of Enderson and of three apparently disinterested witnesses for the State is that after he left the truck the defendant knocked him down with a blow of his hand and then kicked him in the abdomen three or four times. Enderson says "I had bruises lots of places where he kicked. It hurt when he kicked me and he kicked me three or four times. * * * I couldn't hardly straighten up."

David Koth, age 14; his brother Paul Koth, age 19; and Ronald Hoops, age 20, were at the filling station and saw what happened. Ronald Hoops testified for the State that he saw the truck pull into the station; that the defendant got out and went into the station; Enderson got out and walked along the north side of the truck; he came back to them and said "Hello" to Paul Koth; the defendant then walked back toward Enderson "and slapped him down with his left hand. It was a hard slap and

Mr. Enderson did not appear to defend himself. Mr. Bradley then kicked Mr. Enderson three or four times and they were very vicious kicks. The kicks lifted Mr. Enderson off the ground and Mr. Bradley said 'I'll teach you to mess with my wife.' "

David Koth described the attack thus: "Mr. Enderson more or less fell out of the passenger's side of the door, walked over and stood beside us and he said nothing to us but my brother said 'hello'. Mr. Bradley then came out of the station, it being a couple of minutes later maybe and walked toward Mr. Enderson. * * * Mr. Bradley walked over by us, didn't run or anything, just shook his finger and said 'I'll teach you to mess around with my wife', and he took the palm of his hand and hit Mr. Enderson. And it knocked Mr. Enderson hard and roughly enough that Mr. Enderson fell to the ground. Mr. Bradley then started to kick Mr. Enderson, and kicked him two or three times very hard and brutally. I was about five feet away from them when this happened. * * * Mr. Enderson did not fight back and did not, in any way, try to defend himself."

Paul Koth's version of the incident is quite similar. He testified: "I observed Elmer Enderson coming around the side of the pickup and he came up beside me. * * * Here came Mr. Bradley around and he approached Elmer and struck him. * * * He struck Mr. Enderson with his left hand and the hand was open. It was a severe blow and Mr. Enderson fell to the ground. Then Mr. Bradley said to him 'I'll teach you to mess with my wife' and he proceeded to kick him. He kicked Mr. Enderson in the midsection toward the upper part of his body. Mr. Bradley kicked Mr. Enderson about three times. It could have been more or less than three times. The kicks were very vicious without feeling. It was very brutal. The kicks were hard enough to lift Mr. Enderson off the ground. I suppose four inches at least. Mr. Bradley was wearing shoes and the attack took just a few seconds. * * * Mr. Enderson got up and he staggered across the highway and proceeded around the elevator. * * * It appeared as though he had been drinking but he was not drunk."

Dr. James A. Cornish, a practicing physician and surgeon in Storm Lake, was called to treat Enderson on Sunday morning, April 23. He testified that Enderson was "a very ill patient

and there were areas of black and blue over the scalp and skull on the right side, over the left shoulder, and a severe area of black and blue tissue was found in the lower abdomen on the right. * * * We knew he had peritonitis. We made other examinations and we decided to operate on the abdomen immediately and this was done at 2:40 on the same day of admission. I performed the surgery myself and we had to go through an area of black and blueness and when we got beneath the skin, in the fat and muscle, we found the contents from the intestine coming up through into the abdominal wall. We knew that this man had a ruptured bowel—ruptured intestine. We found a tear in the intestine about an inch in length. * * * The man was critically ill. It would take a severe blow in order to produce such an injury as this. It would almost have to go clear through to the spine in order to catch the intestine between the object causing the blow and the hardness of the spine posteriorly. * * * This man would have had to have been injured within twelve to eighteen hours prior. It is possible that the type of injury to his abdomen could have been caused by a hard or severe blow with a weapon of some kind or with a shoe."

The defendant as a witness in his own behalf denied either striking or kicking Enderson. He said that he merely "grabbed" Enderson to keep him from falling down after he descended from the truck; that after Enderson had taken a step or two he fell down, and defendant helped him up. He further testified that "my feet might have contacted him but I did not kick him." His version was that if his feet contacted Enderson at all it was by accident while he was picking him up. Although all three of the State's bystander witnesses said that the defendant said to Enderson as he attacked him " 'I'll teach you to mess with my wife' " he did not claim on the witness stand that the Davis woman was in fact his wife. He referred to her as "my girl friend." Mrs. Davis said she did not see what happened outside the truck.

This is the factual situation which confronted the trial court when the time came to instruct the jury. We think it justified the failure to submit included offenses. If the State's evidence was to be believed, the assault was a vicious and brutal one from

which no conclusion could well be reached but that there was present an intent to inflict great bodily harm upon Enderson. If the defendant's version was to be accepted, there was not even so much as an assault, much less an assault and battery. Intent must usually be determined from acts. When the defendant knocked this aged man to the ground and then kicked him several times in the abdomen so hard that he bounced, a conclusion that he did not intend great bodily injury would be thoroughly unrealistic.

■ The use of a shoe in kicking a victim may under some circumstances make it a dangerous weapon. State v. Brinkley, 354 Mo. 1051, 193 S.W.2d 49, 53; Medlin v. United States, 93 U. S. App. D. C. 64, 207 F.2d 33; Smith v. State, 79 Okla. Cr. 151, 152 P.2d 279, 281. We think the attack made by the defendant upon Enderson, as the State's evidence describes it, was with a dangerous weapon and under the whole record he was either guilty of the major crime as charged or not guilty.

■ ■ V. The fourth and final error assigned complains that the court should have submitted an instruction on the right of the defendant to use force in the defense of a third person. It may be conceded that in proper circumstances one may intervene for the defense of a third person, and in so doing may use such reasonable means, including force, as he could lawfully employ in protecting himself from a similar aggression. Defendant's difficulty here is with the facts. No one, not even the defendant himself, testified that any present assault or attack was being made by Enderson upon the Davis woman when the defendant struck and kicked him. If any attack was made, it occurred in the truck. But Enderson had left the truck, in which Mrs. Davis remained, before defendant struck and kicked him. We have pointed out that defendant himself denies he assaulted Enderson in any way; while the State's evidence is that Enderson had left the truck and walked back to where the witnesses were standing before the attack took place. It is of interest to note that the defendant testified "upon hearing the commotion in the car, I observed that Phyllis was fighting him. It appeared that she was doing most of the fighting and she was kicking at him at the time I opened the car door." The State's witnesses

say that Enderson had left the truck and approached them before Bradley came up to him. In any event, the record is entirely devoid of any indication that the defendant's attack on Enderson was made for the purpose of defending Mrs. Davis. No instruction on the point would have been justified by the facts.

VI. We have examined the entire record as we are required to do under the provisions of section 793.18 and find no error. Although no error is assigned on the point, we have given attention to the fact that the defendant was not represented by counsel at the time of his arraignment and during the selection of the jury and the State's opening statement. However, we have pointed out that the court repeatedly advised him of his right to such representation, even to the extent of advising him he should have it. This he refused. We have discussed this question at length in Carpentier v. Lainson, 248 Iowa 1275, 1280, 1281, 1282, 84 N.W.2d 32, 34, 35, 71 A. L. R.2d 1151; and there we cited several authorities. The court here did everything possible to protect the defendant's rights and insure him a fair trial.

VII. In citing authorities defendant's counsel in many instances gives us only the Iowa Reports and volume and page. While we are cognizant that this is a criminal case, we think it proper to suggest that the court will be considerably aided if the Northwestern Reporter citation is also given, as is required in civil cases by R. C. P. 344(e).—Affirmed.

All JUSTICES concur.