STATE OF IOWA, appellee, v. JOHN AUSTIN TORNQUIST, appellant.

No. 50537.

(Reported in 120 N.W.2d 483)

March 12, 1963.

Edward A. Doerr and Charles G. Rehling, both of Davenport, for appellant.

Evan Hultman, Attorney General, John H. Allen, Assistant Attorney General, of Des Moines, Martin D. Leir, County Attor-

ney of Scott County, and Norman M. Peterson, Assistant County Attorney of Scott County, for appellee.

THOMPSON, J.—On February 21, 1961, the body of Jacqueline Jane Tornquist, a four-year-old girl, was brought to the emergency room of St. Luke's Hospital in Davenport by the defendant, her stepfather, and his wife, Phyllis Ann Tornquist, her mother. The child was not breathing when brought to the hospital. A nurse administered oxygen, and Dr. H. M. Hurevitz, who was in the hospital, was called immediately. He determined she was dead, but attempted to resuscitate the child by administering artificial respiration. All efforts failed and she was pronounced dead.

Some questions were asked of the defendant as to what had happened and he answered. Shortly after he was taken to the police station in Davenport, questioned by police officers, and a written statement obtained. On March 27 next a county attorney's information was filed in the Scott District Court, charging the defendant with the crime of murder of the second degree. He pleaded not guilty, and upon trial to a jury was found guilty of the included crime of manslaughter. A motion for new trial was filed and denied, and judgment entered on the verdict. From this we have the present appeal.

The defendant assigns several errors which are claimed to have resulted in the denial of a fair trial. We shall consider them in order. Facts essential to a consideration of each error will be stated as the errors are discussed.

I. The first assigned error relates to claimed misconduct of the prosecuting attorney. The alleged misconduct divides into two parts: first, that in his opening statement the attorney for the State told the jury the State would prove mistreatment of the child by the defendant at other times not immediately connected with the fatal injury, which the defendant claims was evidence not admissible, and some of which was in fact excluded when offered; and second, that the State prosecutor was guilty of prejudicial misconduct in offering exhibits claimed to show bloodstains which did not in fact so show, and this was known to the State when it offered them. No mistrial was asked

by the defendant at anytime because of these alleged improper statements or offers.

We shall deal first with the claim of improper statements concerning other abuses and mistreatments. A separate assignment, which will be considered later, asserts error on the admission of the evidence of these. We are concerned at this point only with the question whether the opening statement of the county attorney in regard to them was so prejudicial that it denied the defendant a fair trial.

The assistant county attorney, who made the opening statement for the State, told the jury that what the attorneys said was not to be considered as evidence or testimony in the case; that what he said was merely a statement of what the State expected to prove; that it was possible there might be rulings made which would exclude certain evidence, or for some other reason evidence the State relied on might not be produced; "so that I wish in no way to indicate by this opening statement that these are the exact and precise facts throughout." When the evidence as to other abuses of the child was produced, some of it was admitted and some excluded.

In State v. Thompson, 241 Iowa 16, 29, 39 N.W.2d 637, 644, we said: "* * * in every case that is tried, there are usually found statements by counsel as to what they expect to prove but later find that they are unable to do so. * * * we are not prepared to say that such statements show deliberate bad faith on the part of counsel, such as to constitute reversible error." This was quoted with approval in State v. Myers, 248 Iowa 44, 51, 79 N.W.2d 382, 387. See also State v. Allen, 100 Iowa 7, 9, 69 N.W. 274. The defendant offered no objection to the opening statement for the State as it was made, and did not ask a mistrial. But he now contends that the statement was so prejudicial that no ruling of the court could obviate it or remove its prejudicial effect from the minds of the jurors. State v. Tolson, 248 Iowa 733, 82 N.W.2d 105; State v. Clark, 160 Iowa 138, 140 N.W. 821, and several other cases are cited.

 Without doubt we have held, under varying facts, that a course of conduct by the prosecution, such as unfounded statements made in bad faith, repeated asking of improper questions

or other activities of the prosecution may have the effect claimed by the defendant here. But we have also said that generally the trial court has a large though not uncontrolled discretion in determining whether such harm has been done. State v. Bolds, 244 Iowa 278, 281, 282, 55 N.W.2d 534, 535, 536, and citations. We find no abuse of discretion here. If counsel had thought at the time the opening statement was made that it had the effect now claimed, a motion for mistrial would have been much in order. That no such motion was made leads to the conclusion that the damage was not so vital as counsel now assert.

■ The second basis for the claim of misconduct of the State's counsel, the introduction of improper and immaterial evidence, is answered by much the same line of authorities and reasoning as the first. The prejudicial error here is asserted to arise from the introduction by the State of certain articles known in the record as Exhibits 54, 55, 56, 57, 58 and 60 through 65 inclusive. Officers of the Davenport police department testified as to where the articles were found, and that each contained stains which appeared to be blood. These were at first admitted. An expert witness for the State later testified that Exhibits 54, 55 and 56 did contain bloodstains; that 57 and a part of 58 possibly contained bloodstains but he was unable to confirm them; that a part of 58 did not contain bloodstains, Exhibit 58 being a pajama set of coat and pajama top and bottom; that Exhibits 60 and 61 had stains which looked like, but were not, blood; and that 64 and 65 contained stains which were not blood. On motion of the defendant the trial court withdrew Exhibits 57, 58, 60, 61, 64 and 65 from the consideration of the jury and admonished the jury to disregard them as being immaterial; and to disregard the testimony of the police officer who had testified to the Exhibit 58, the pajama set, as to any bloodstains thereon.

Again we do not find the discretion of the trial court abused. The authorities cited above, State v. Bolds, supra, and the cases cited therein, are in point; and this is particularly so in the absence of a motion for mistrial by the defendant. We do not say such a motion would have been good in any event; but that

none was made again brings the thought that counsel did not regard the evidence introduced and later stricken as so damaging that their client could not receive a fair trial thereafter. In this we agree.

II. The second assigned error raises the important question of the sufficiency of the competent and material evidence to warrant submission to the jury; in other words, was there a jury question? The trial court submitted the question of the defendant's guilt of murder of the second degree, and the included offense of manslaughter; and the jury convicted him of the latter. He contends there was insufficient evidence to generate a jury question; and, as a collateral complaint, that it was prejudicial error to submit second-degree murder.

It is correct to say that at this point we consider the evidence adduced by the State to be the material and governing consideration. If the defendant's evidence contradicted that of the State on material points, it did no more than make a question for the jury to decide. The fact of contradiction by the defendant is ordinarily not important when considering whether the State has made a prima facie case.

The State's evidence must be stated in some detail at this point. The defendant resided in Davenport with his wife and the child, Jacqueline Jane Tornquist, his stepdaughter, age four years. The defendant was a representative and "troubleshooter" for a chain and cable company who traveled over territory in Iowa and neighboring states. His wife was also employed. When she was at work, the defendant often cared for her small daughter, Jacqueline. He would take her with him on local trips or at times care for her at home. On February 20, 1961, he took her with him on a trip to Galesburg, Illinois. About five p.m. he returned to Davenport and stopped at a tavern, leaving the small girl in the car. He said he estimated his time in the tavern at about one hour; the tavern keeper thought it about one hour and one half. Some time after returning home, perhaps the next day, he discovered scratches on the instrument board of the car, which he says the little girl admitted she placed there. So he undertook to chastise her. How he did this is the vital question in the case.

It is shown without contradiction that the defendant had charge of the little girl on February 21 for several hours immediately preceding the time she was taken to the hospital, already dead, about 4:20 p.m. Her mother had been at work during that time; but when she returned home a few minutes after four the defendant met her at the door and told her "something had happened to Jackie." They at once took the child to the hospital. It will be noted that there is substantial testimony from a medical expert, Dr. Francis C. Tucker, a pathologist, that the fatal injuries sustained by Jacqueline, a severe rupture of the liver and some damage to the pancreas, were sustained within three hours prior to her death; a time when she was in the sole custody of the defendant. Upon arrival at the hospital she was not breathing. A nurse, Jeanne Roland, at once started to administer oxygen, and called Dr. H. M. Hurevitz. She asked the defendant whether the child had been ill, and "just what was wrong." He said " 'Well, I beat her.' " Carol Madsen, another nurse who came into the room while Doctor Hurevitz was at the emergency table, heard the defendant say, apparently in answer to a question from Doctor Hurevitz, " 'I hit her.' " Doctor Hurevitz testified that in response to questions from him the defendant said that the child had not been sick; and further, when the doctor asked him what had happened, he said " 'I hit her.' " All of these questions and answers were objected to on the ground that they revealed privileged communications, but the objections were overruled by the trial court. We shall indicate our agreement with this ruling in a later division of this opinion; and so we consider the statements of the defendant to be substantial evidence showing the corpus delicti and his responsibility for the injuries.

The defendant was taken to the police station from the hospital, after the matter had been reported to the authorities. He was questioned there, and made a written statement, which was admitted in evidence. In this he told of taking care of Jackie on February 20, and of leaving her in the car back of a tavern in Davenport for about an hour in the late afternoon. Later in the evening he noticed some scratches on the instrument board of the car, which Jackie said she had put there.

He told her she deserved a spanking for doing that. The next morning, after his wife had left for work, he proceeded to administer the punishment, spanking her with a spatula on the buttocks. He also slapped her on the mouth or cheek. About nine a.m. he took Jackie in the car and drove to Cedar Rapids, but did not stop there, returning at once to Davenport. He got Jackie something to eat, and went to the basement to his workbench there. While there he heard a thump and discovered Jackie had fallen down the cellar steps. Two police officers testified that the next morning after making the written statement he admitted that part about the fall down the stairs was not true; and there is medical testimony that the injury to her liver could not have been caused by such a fall. Jackie complained her stomach hurt, and he took her upstairs to the bathroom, where she vomited in the bathtub. He undressed her and put on her pajamas; she continued to complain of her stomach hurting her, and when Mrs. Tornquist came home she immediately decided Jackie must have medical attention, and they took her at once to the hospital, where she was not breathing on arrival and after vain attempts at resuscitation was pronounced dead. Objections were lodged to the admissibility in evidence of this written statement; but again we shall deal with these contentions in a later division; and since we think the statement properly admitted, we consider it with the other evidence in this division on the question of adequate proof of the defendant's guilt of the offense charged or an included offense to engender a jury question.

 Significance must be given to the statement given by the defendant at the police station that Jackie had fallen down the basement stairs on the afternoon of her death. This, according to the testimony of one of the officers, he admitted the next morning was false. In fact, in his testimony in the case, he did not claim Jackie had had any fall at the family home on the day of her death such as he told of in the written statement, but said she had fallen about two days before at a friend's home. Under similar circumstances we said of false testimony on a material point: "If he had lied about it, it was a circumstance against him." State v. Feltes, 51 Iowa 495, 499, 1 N.W.

755, 759. Later in the same case, we said: "The fact that the defendant told false stories in regard to the boy's disappearance is a circumstance tending to establish his guilt, independently of his confession of guilt." Loc. cit. 51 Iowa 501, 1 N.W. 760.

On the witness stand the defendant told of a fall he said Jackie had suffered in the automobile while riding with him a few hours before her body was taken to the hospital. But his statement to the police said nothing of this; the fall related there was the claimed one down the cellar stairs. Much the same inference may be drawn from this; that is, that his story was not truthful at one point or the other, or both; and, if so, it was an independent circumstance tending to show guilt. The determination of truth or falsity was for the jury; and if found to be false it was substantial separate evidence of guilt. There is also evidence from the police officers that the defendant admitted he had slapped the child twice, and that he had a "raging temper." This in itself would not prove him guilty of a crime, but was a circumstance which if believed would strengthen the State's case.

Dr. Charles B. Preacher, a qualified pathologist, performed an autopsy on Jackie's body on the evening of February 21. He told of the extensive damage to the liver, and expressed his opinion that death was caused by an external force which resulted in severe hemorrhage. He said that in his opinion death resulted "within less than an hour, and up to two to three hours in this case." His opinion was that the injury was caused by a localized rather than a generalized force; that it was caused by an instrumentality; that it was caused by a blunt instrument smaller than the width of the child's body; and it could have been caused by a fist.

Doctor Preacher also testified to the external condition of the body. There were numerous bruises, several abrasions or scratches and small cuts. There were contusions or bruises on the scalp; a small cut over the right eye, a bruise over the right cheek, a bruise over the left lateral shoulder and a bruise on the skin at the lower end of the sternum. There were bruises on the left elbow, and bruises on the buttocks which were blotchy and mottled, and other contusions on the back parts of the

thighs and the front part of both lower legs, bruises on each hand, and a bruise just below the right iliac crest, the bony protuberance over the side and lower end of the abdomen. There were small cuts inside the lower lip.

Doctor Tucker expressed his opinion that the injury to the liver was caused by a considerable force directed at one particular area; that the usual activities of a child, "including falling downstairs and that sort of thing", could not have caused it. His opinion was that it was caused by some object three to five inches in diameter, "A fist of this sort would fill that category."

We have then, the undisputed fact that the child was in the sole care of the defendant during the time the injury must have occurred, as fixed by the medical opinions; that she suffered a severe injury causing her death; that she had numerous cuts and bruises over her body; the defendant's admissions that "I did it", that "I hit her", and that "I beat her". His written statement tells of a spanking administered and a slapping in the mouth; and shows an attempt to relate the injuries to a fall downstairs, which he later admitted was not true, and which in any event the medical testimony says could not have caused the injury.

The defendant properly says that corpus delicti requires proof of two elements: one, that a particular crime has been committed, and two, that it was committed by the willful act of someone criminally responsible for it. Numerous cases are cited; but we think the showing set forth above is ample to meet both requirements. The child was killed by a blow of some sort; the defendant admitted that he did it, that he beat her, and that he hit her. At least there is substantial competent testimony as to all of these matters. Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 379, 380, 101 N.W.2d 167, 172, is cited to the point that medical testimony that an injury *could have been* caused in a certain way is not enough to create a jury question; it shows a possibility rather than a probability. But the opinion also says: "Standing alone this is insufficient proof of the claimed causal connection. * * * However, we have held such expert evidence as that given here is sufficient to warrant

submitting to the jury the issue of proximate cause when coupled with other testimony, nonexpert in nature * * *." Here there is ample other testimony connecting the defendant with the act causing the injury. While the defendant did not in terms admit hitting the small girl with his fist, he did say he hit her, and he beat her, and he caused her condition as it was when she was taken to the hospital. It is not denied that the corpus delicti may be proven by circumstantial evidence. The true rule is laid down thus in 23 C. J. S., Criminal Law, section 916(3), pages 631-633: "Extrajudicial admissions, declarations, or confessions of accused may be considered in connection with other independent evidence in determining whether the corpus delicti is sufficiently proved; and it is sufficient when the evidence independent of the confession, together with the confession, establishes the corpus delicti beyond a reasonable doubt." There was no confession here, in the strict sense of the term; but there were admissions which showed the connection of the defendant with the offense. In considering admissions, generally we may use the rules governing confessions as a guide in criminal cases. State v. Cameron, 254 Iowa 505, 511, 117 N.W.2d 816, 819, and citations.

■ As a corollary proposition, the defendant urges that there was at the best no evidence of malice sufficient to warrant the submission of the offense of murder of the second degree, and accordingly that prejudicial error resulted. We held in State v. Heinz, 223 Iowa 1241, 1259, 275 N.W. 10, 21, 114 A. L. R. 959, that malice and a criminal intent may be inferred from the intentional use of a deadly weapon in a deadly manner; and that the hands and fists of a defendant violently used in causing the death of a small child—in that case a six-year-old boy—were instruments likely to cause death and under such circumstances were dangerous weapons. State v. Bradley, 254 Iowa 211, 222, 116 N.W.2d 439, 445, holds that a shoe when used in kicking a victim may under some circumstances be a dangerous weapon. Little discernment is required to conclude that the fist, or indeed the hand, of a strong man may readily kill a small four-year-old child. Malice might well be inferred if the jury found the facts to be that the defendant had severely

beaten the little girl. We think there was ample evidence from which such a determination might be made. The jury did not in fact convict of second-degree murder, but only of manslaughter; but we think the higher degree was properly submitted. It follows that no error is shown.

III. C. L. Brookstra and his wife each testified that in the summer of 1959 the defendant and his wife and the small girl Jackie lived next door to their home. They said that on a number of occasions, generally between 6:30 and 7:30 in the mornings, they heard the child crying, and at least once her outcry was so severe that it was very upsetting to them. They heard the little girl say " 'Daddy, don't hit me anymore' "; and the defendant's answer " 'I'll teach you not to wet the bed anymore.' " At this time Jackie was about two years old. Katherine Bowen, who rented an apartment above her own residence to the defendant and his family in 1958, testified to numerous spankings administered to Jackie by the defendant. These occurred almost every evening, when the defendant returned from work.

Two other witnesses gave somewhat similar testimony, but this was later stricken from the record and the jury admonished not to consider it. The defendant predicates error on the admission of the testimony of the Brookstras and of Katherine Bowen. It is urged that there is no showing that the chastisements were in fact administered by the defendant; that in any event it does not appear they went beyond the proper discipline which a parent may give a child; and the acts were insufficient to show malice.

The trial court was extremely careful to protect the rights of the defendant at this point. The State urges that the excluded testimony of Lula Sutton, who testified to seeing severe bruises on the buttocks of the girl, was in fact proper, and its exclusion was in fact error against the State. With this we are inclined to agree. In Clark v. State, 151 Tex. Cr. 383, 386, 208 S.W.2d 637, 639, it is said: "Testimony to the effect that on previous occasions the appellant had whipped the child severely was admissible on the issue of malice and ill will on the part of the appellant towards the child." This was in a

prosecution for murder. State v. Cole, 63 Iowa 695, 697, 17 N.W. 183, 184, is also in point. There the defendant was charged with the murder of his wife by poison. Evidence that he had referred to her slightingly, that he allowed her to work out of doors in cold weather in insufficient clothing while he was warmly clad, and had compelled her to get into a pen and milk a vicious cow was held proper. We said: "It may be conceded, as the defendant claims, that upon a trial for a criminal offense evidence of independent acts of bad conduct is not ordinarily admissible, and in no case to establish the body of the crime. But upon a trial for murder, where there is evidence that would justify a jury in believing that a crime has been committed by someone, and there are circumstances which point to the defendant as the guilty person, evidence of conduct exhibiting a bad state of feeling on the part of the defendant toward the deceased is admissible."

In Thiede v. People, 159 U. S. 510, 517, 518, 16 S. Ct. 62, 65, 40 L. Ed. 237, evidence of witnesses who heard the deceased scream several times; of seeing her with black eyes and a bruised face, and her eyes appearing red, and to bruises on her body and to her appearing frightened was admitted, and its admission upheld by the United States Supreme Court, which quoted with approval from Holmes v. Goldsmith, 147 U. S. 150, 164, 13 S. Ct. 288, 292, 37 L. Ed. 118, 123: "As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and, therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more [nearly] correct their judgment is likely to be."

IV. Section 755.17, Code of 1962, makes it mandatory that any peace officer or other person having custody of any person restrained of his liberty for any reason shall, before preliminary hearing and arraignment, with exceptions not here material, permit the person so detained, without unnecessary delay after arrival at the place of detention, to call, consult and see a member of his family or an attorney of his choice. The defendant requested an instruction which would have told the jury that if it found any of the privileges (they are really

rights) granted by the statute had been denied him, they should entirely disregard State's Exhibit 51, (his written statement) and any testimony of police officers as to oral statements claimed to have been made by him either on the evening of February 21 or the morning of February 22, at which times he was being held and questioned at the police station. The instruction was refused, and the court gave only the stock instruction on voluntariness of confessions and admissions. The defendant asserts error.

We have recently dealt with this statute and with a requested instruction identical in substance with the one asked here. State v. Cameron, supra, 254 Iowa 505, 511, 117 N.W.2d 818, 819. We there said that the requested instruction went too far, and that the denial of the right to communicate would be an indicia of involuntariness only, but not conclusive; and that the jury should be instructed to that effect upon a possible retrial, with the same or similar evidence. While the defendant's requested instruction in the instant case has the same vital defect as the one in the Cameron case, he now urges that it was sufficient to alert the court to the statute, section 755.17, supra, and the need for a proper instruction. Assuming without deciding that the asked instruction was sufficient for that purpose, we are compelled to say that there is no evidence which would require or support the giving of an instruction such as we said would be mandatory in the Cameron case. There the defendant had testified that immediately upon being taken to the police station he had requested the right to telephone to an attorney, which right was denied him. The defendant here makes no such claim. He said at first that he called the police officers and asked them to tell him what was going on; and told them to come and get him so he could be with his wife, because she was so upset. Then he said: "I didn't ask to be with any of my family or have any of my family with me during the time of questioning. I assumed that the procedure was usual and that after it was all over I would go on home."

Not long after the defendant was taken to the police station, his father and mother appeared there and waited in one of the rooms. After some time they decided to ask their son whether

he wanted an attorney. They asked a police officer if he would go back and ask the defendant if he desired an attorney. Paul Tornquist, defendant's father, testified that the officer went away and in "a very short time; just long enough, I presume, to ask a question and return", he came back and said that the defendant wanted a certain attorney. The attorney suggested was in fact connected with the county attorney's office and so could not represent the defendant; but other counsel were shortly procured. The defendant also testified to the incident of the verbal message sent him by his father concerning counsel. He said that while his statement was being dictated and typed, a police officer came to the room and told him his father wished to know if he wanted counsel. He asked the officers present if he needed one, but they did not reply. So he advised the officer to tell his father he did desire an attorney. The police seem to have acted with all possible speed in communicating the question and defendant's answer. We find no evidence of any violation of section 755.17. The defendant was allowed to communicate with counsel immediately when he requested it. His parents were at all times aware of his whereabouts, and he did not ask to see or consult with them. The statute says only "permit"; it does not compel the authorities to require a person in custody to make a telephone call or ask that his family be notified or that he be permitted to consult with them. The choice is his, rather than that of the police or the family or the attorney. There is no showing here that the defendant attempted to exercise his rights under the statute, much less that any were denied him. An instruction as to the statute would have had no support in the evidence. The defendant urges that he did ask to "come and get him so he could be with his wife, because she was so upset." This seems to mean that he was asking to be released in order to comfort his wife; the statute relied upon is clearly meant to give a person held in custody the right to consult with or have the advice and aid of members of his family in regard to his own troubles. It is also pointed out that there is evidence he was told "No one is coming to see you." This was covered by the stock instruction above referred to, which told the jury it should consider all of the facts and

circumstances existing at the time the alleged confession or admissions were made. State v. Williams, 245 Iowa 494, 500, 62 N.W.2d 742, 745, and citations.

It is also contended the police should have told the defendant when he asked for a call to a named attorney that the attorney was an assistant county attorney and would not be able to represent him. We do not agree. It was not the province of the police to interfere with the choice of an attorney for the defendant, nor to decide whether the attorney suggested was qualified to appear for him. We think the instruction given by the court gave the defendant all he was entitled to under the facts shown here.

V. In Division II we referred to certain testimony of Doctor Hurevitz and two nurses as to statements made by the defendant at the hospital concerning the cause of Jackie's injuries. The defendant urges that these statements were privileged, under Code section 622.10, and that prejudicial error resulted from the denial of his objections. We said in State v. Smith, 99 Iowa 26, 30, 68 N.W. 428, 429, 61 Am. St. Rep. 219: "The prohibition of the statute is not limited to communications with the patient, but applies to all communications of the character indicated in the statute, from whatever source, * * *." We were speaking there of communications between physicians attending or consulting in the same case. But the defendant thinks the language is exact enough to apply to such communications as were testified to by the doctor and nurses here as coming from him. We need not determine that question. The record shows that the small girl was dead upon arrival at the hospital. Doctor Hurevitz so testified, but made an attempt at resuscitation as a matter of precaution, nevertheless. He said the information elicited from the defendant was of no aid in his efforts, and the end result was only a confirmation of his first determination that the child was dead.

We have held that the doctor-patient relationship terminates upon the death of the patient. Cross v. Equitable Life Assurance Society, 228 Iowa 800, 806, 293 N.W. 464, 467. Here the patient was never seen by Doctor Hurevitz while she was alive; and it would be necessary to say that a privilege extended to the defendant which was never available to the deceased to

uphold the contention at this point. A somewhat related point is of interest although not necessarily conclusive here. In State v. Grimmell, 116 Iowa 596, 600, 601, 88 N.W. 342, 343, 344, we said: "This, as will be observed, is a criminal case, and it surely will not do to hold that a statute intended to protect a patient should operate as a shield for one who is charged with murder. Such a construction, while perhaps technically correct, is evidently so foreign to the purpose and object of the act, and so subversive of public justice, that it ought not to be adopted, except for the most imperative reasons. The safety of the public is the supreme law of the commonwealth, and we do not think the legislature, in passing the act in question, intended it to operate as a barrier to the enforcement of the criminal laws of the state. If the patient were alive, no one but she could waive the prohibition. But * * * she is dead and unable to speak. If in a civil case her representative may waive the prohibition, we see no good reason for saying that in a criminal one the prohibition is absolute. The purpose of the statute, as we have said, is to protect the patient, and not to shield one who feloniously takes his life."

Here the child is dead. She was in the sole custody of the defendant for several hours prior to her injury and death. Her injuries, at least the fatal one, under the medical testimony, were such as would be most unlikely to happen in the ordinary child's play, including the claimed fall down the cellar stairs. The statements of the defendant to the doctor were of no aid in any treatment which could be given her. We agree with the holding in the Grimmell case that the statute was not intended to be used as a shield for one accused of her murder. It may be that the language employed in that case is somewhat extreme, and must be used with strict limitations; but we think it points to a desirable standard of application of the privilege statute. We cite the case here only on the point that the statute should be applied with care and should not be extended beyond its fair meaning.

So in the instant case we think the fact that the child was dead when the doctor was called is of first importance. It is true he tried resuscitation by artificial breathing; but this, his

testimony shows, was only a precaution and did not affect his determination that she was dead when he first saw her; and the result proved this diagnosis was correct. A doctor may testify as to his findings upon an autopsy, since the relation of physician and patient has ended, if it ever existed, with the death of the patient. Cross v. Equitable Life Assurance Society, supra. Our decision in this case may be put on that ground; and if the holding seems narrow and technical, the answer is that the privilege statute is itself an artificial one. No such privilege existed at common law. Travelers' Insurance Co. v. Bergeron, C. C. A., 8th Cir., 25 F.2d 680, 682; 5 Wigmore, Evidence, Second Ed., section 2383.

 The essential elements of communication privileged under the doctor-patient relationship are these: 1, the relation of doctor and patient; 2, information acquired during this relation; and 3, the necessity and propriety of the information to enable the doctor to treat the patient skillfully in his professional capacity. Union Pacific R. Co. v. Thomas, 8th Cir., 152 F. 365, 367, 81 C. C. A. 491; Van Wie v. United States, 77 F. Supp. 22, 44. In Travelers' Insurance Co. v. Bergeron, supra, loc. cit. 25 F.2d 683, it is said: "A deceased body is not a patient. The relation of physician and patient ends when the death of the patient ensues. * * * Treatment cannot avail after death."

It is true we have said that the privilege statute is to be liberally construed to carry out its manifest purpose. Newman v. Blom, 249 Iowa 836, 844, 89 N.W.2d 349, 355. But we cannot, under the guise of liberal construction, extend the statute to cover cases in which one of the three essential elements—the relation of physician and patient—is lacking. In view of the fact that no such privilege was known to the common law, we are faced here with a problem of statutory construction; and when the first and most basic essential is not present, we cannot say the privilege exists. The little girl was dead when first seen by the doctor, and she remained dead despite his efforts to revive her. There was no patient, and so no confidential relation covered by the statute.

 Other considerations point to the admissibility of

the evidence of the doctor and the two nurses. The burden is upon one who claims the privilege to show that it exists. State v. Masters, 197 Iowa 1147, 1150, 198 N.W. 509, 510; Stoddard v. Kendall, 140 Iowa 688, 692, 119 N.W. 138, 140. It is also thoroughly settled that ordinarily a communication made in the presence of a third person is not within the statute. 97 C. J. S., Witnesses, section 299, page 839; Lewis v. Beh, 206 Iowa 281, 284, 285, 218 N.W. 944, 945. It is evident that if a communication, otherwise privileged, is made in the presence of a third party not an employee of or an assistant to the physician, attorney or other person coming within the terms of the statute, the reason for the privilege is gone. It is not then a secret between the patient, or client, and the professional man.

 So in the instant case the statements made by the defendant to the doctor were in the presence of one Carol Madsen, who testified to some of them. It is true she was the director of nursing services at the hospital; but the record does not show she was present as an assistant to Doctor Hurevitz. In fact, it seems to show affirmatively to the contrary. She said she had heard from the child's mother that she had been brought to the emergency room, and she went there. As she opened the door she heard the defendant say " 'I hit her.' " There is no showing that Miss Madsen was there to aid the doctor, or that she did so. The defendant cites Meyer v. Russell, 55 N. D. 546, 214 N.W. 857, and Culver v. Union Pacific R. Co., 112 Neb. 441, 199 N.W. 794, to the point that a communication to a nurse present at a conversation between patient and doctor is within the prohibition of the statute. The cases do not go quite so far. In fact, it is pointed out that a nurse, as such, is not within the prohibition; this is true only when she is acting as an agent of or assistant to the physician in charge. Culver v. Union Pac. R. Co. supra, loc. cit. 112 Neb. 450, 199 N.W. 797. This distinction is pointed out in Meyer v. Russell, supra.

VI. Defendant's next assigned error asserts the court should have permitted him to secure answers to certain questions asked by his counsel of John Wesley Heaton, a police officer, who was called as a defendant's witness. The matter being inquired into concerned how many pills the witness had

given to the defendant while he was held at the police station on the night of February 21–22, 1961. He testified that he had given the defendant one pill at 1:30 and one at 6:30. Defendant's counsel, viewing the officer as a hostile witness although called by them, attempted to interrogate him by leading questions in the nature of cross-examination as to whether he had not told the examining attorney in a telephone conversation that he had given four pills rather than two. Objections that this was an improper attempt to impeach defendant's own witness were sustained by the court, and this constitutes the basis for the claimed error.

▆▆▆ The materiality of the question whether two or four pills were given to the defendant is not clear. In any event, the trial court had a considerable discretion in permitting leading questions put to a supposed hostile witness. 98 C. J. S., Witnesses, section 477, pages 357, 358. Such examination may be permitted when a party is surprised by the answer of a witness; but here counsel evidently knew before he put the witness on the stand that his answers would not be what he had previously thought. And, since no offer of proof was made, we cannot know whether the witness would have answered "Yes" or "No" if the questions had been answered.

▆▆▆ The rule, we think, is that direct impeachment alone may not be permitted; but indirect and incidental impeachment may be allowed by a showing by other evidence that the witness did not give the same version on the stand as he had at other times. Underhill's Criminal Evidence, Fifth Ed., Volume 1, section 231, pages 537 and 538. Contradiction of one's own witness by other testimony is allowable. But here the questions tended to direct impeachment; the defendant made no effort to show by other evidence that his witness had not told the truth. Nor does the materiality of the matter appear. We find no error.

▆▆▆ VII. Next it is contended that the court committed prejudicial error when it refused to permit a neighbor to testify to an alleged statement made by Jackie on the evening of February 19. The witness had testified that Jackie was at her home playing with her children, and that "she came up the

stairs crying". A question as to whether Jackie said anything to the witness at that time was objected to and the objection sustained. Offer of proof that the witness would testify that Jackie told her she had fallen and hurt herself on the steps of the witness' home was made, and denied.

We shall consider this assignment no further than to say that whether or not the ruling was correct, there could have resulted no prejudicial error. The death of the small child was caused by a badly ruptured liver; and whatever caused the injury must have happened within a few hours before her body was taken to the hospital. No offer was made to show that Jackie had sustained any bruises or cuts or other injuries in a fall at the Dennison home. The trial court has a considerable discretion in ruling on admissibility of claimed res gestae evidence, and we find no abuse here, State v. Stafford, 237 Iowa 780, 787, 23 N.W.2d 832, 836.

VIII. The final specific error charged concerns the court's Instruction No. 11. In this, the court told the jury that all evidence offered by the State "other than any statements or admissions by the defendant" was circumstantial; and it told the jury that while a crime might be proven by circumstantial evidence, the facts and circumstances proven must be consistent with each other, with the main facts to be proved and with the guilt of the defendant, and must also be inconsistent with any rational theory of his innocence.

The error relied upon is that there was in fact no direct evidence, and the court should have so told the jury. The thought at this point is that the statements and admissions were no more than circumstantial evidence, and so it was error to tell the jury that except for them all evidence was circumstantial. Authorities are cited on the point that the court erred in failing to tell the jury there was no direct evidence. None of them touches the question whether confessions or admissions are actually direct evidence. But there are numerous authorities which hold such evidence is direct. In Underhill's Criminal Evidence, Fifth Ed., Volume 1, section 4, page 5, is this statement: "Direct evidence of the crime is the evidence of an eyewitness that it was committed. This includes in criminal law

the confessions and admissions of the accused and dying declarations."

To the same effect are State v. Nortin, 170 Ore. 296, 133 P.2d 252, 263; Fisher v. State, 154 Neb. 166, 47 N.W.2d 349, 353; Evans v. State, 199 Ind. 55, 155 N.E. 203, 206; State v. Criger, Mo., 46 S.W.2d 537, 539. The court correctly excepted the statements and admissions of the defendant from the category of circumstantial evidence.

IX. Finally error is assigned upon the denial of defendant's motion for a new trial. This was based upon the various contentions discussed in detail above, and is answered by our holdings set forth in the preceding divisions. However, the defendant goes at some length into the evidence which it is claimed shows him to have been a good citizen and a kindly man, who would have been most unlikely to commit the sort of crime with which he was charged. There is such evidence, introduced on his behalf. But there was considerable countervailing evidence for the State; and the final determination was for the jury.

X. We have examined not only the contentions of the defendant as shown by his assigned errors, but the entire record for the purpose of determining whether any substantial rights of the parties were denied or abridged. This we are required to do by section 793.18 of the Code. It is our conclusion that the defendant had a fair trial in all respects.—Affirmed.

All JUSTICES concur except HAYS, J., not sitting.